# The Commonwealth *versus* The Pennsylvania Canal Co.

66    41
152   128

66    41
203   ⁷287
203   362

66    41
27 SC ⁸ 6

1. In 1857 the Commonwealth sold to the Pennsylvania Railroad Company the public works, including the canals, with all the rights, &c., and with authority to resell. In March 1866 an act was passed requiring owners of dams on the Susquehanna, &c., to make sluices in them for the passage of fish as directed by a commissioner: on failure they were indictable for nuisance. In May 1866 the Pennsylvania Canal Company was incorporated and authorized to buy and the railroad company to sell the canals, &c., including dams in the river; in 1867 the canal company bought the canals, &c., and refused to make the sluices. *Held*, that they had all the rights in canals, &c., conveyed to the railroad company, and were not liable under the Act of March 1866.

2. The Commonwealth has the same power, and no more, over property

granted to a corporation than that granted to an individual. Per PEARSON, P. J.

3. If a law creating an offence expires or is repealed before indictment there can be no prosecution, or if after conviction sentence cannot be passed. *Id.*

4. A charter cannot be revoked against the consent of the corporation, unless when power to do so is reserved. *Id.*

5. The legislature has not power to throw the burden of making and maintaining the sluices on a grantee of the railroad company. *Id.*

6. By the sale of the public works, the dams became the private property of the purchaser and cannot be taken by the state except by paying the owner an *equivalent. Id.*

7. Every legislative grant is with the implied right that it shall not injure others. *Id.*

8. The police power of the state is nothing more than the authority to compel all owners of property so to use it as not to injure others. *Id.*

9. The state cannot part with the power to compel the owner of real estate so to use it, as not to endanger the public health or safety. *Id.*

10. The Act of March 30th 1866 (Fish Act) is void so far as it imposes on the Pennsylvania Canal Company the duty of changing the dams at their own cost. *Id.*

11. All legislative acts alienating public rights or domain are to be strictly construed, and no such grant is to be inferred by implication merely.

12. The maxim, *verba relata hoc maxime operantur per referentiam ut in eis inesse videntur,* applied in this case.

13. The Act of 1857 for the sale of the public works, authorizes a sale to any corporation created after its passage and before a sale or lease authorized in the 5th section.

14. The Pennsylvania Canal Company, by their purchase under the Act of May 1866, stood in the shoes of the railroad company as parties to the contract of 1857.

15. In an indictment under the Fish Act, the canal company were to be treated as if the question was with the railroad company.

16. Erie *v.* Erie Canal Co., 9 P. F. Smith 174, recognised.

March 19th 1870.   Before THOMPSON, C. J., READ, AGNEW and SHARSWOOD, JJ.

Error to the Court of Quarter Sessions of *Dauphin county :* to May Term 1870, No. 11.

The Pennsylvania Canal Company was indicted in the Court of Quarter Sessions of Dauphin county, on the 21st of November 1867, for refusing and neglecting to keep sluices open in their dam in the Susquehanna river, at Duncan's Island, under the 2d and 3d sections of the Act of March 30th 1866, Pamph. L. 370, "relating to the passage of fish" in the Susquehanna and its tributaries.

The Act of May 16th 1857, Pamph. L. 519, directed the sale of the public works,. with all the property thereto appertaining, or in anywise connected therewith, and authorized any corporation, then or thereafter incorporated, to become the purchaser, with power, by the 3d section, to such purchaser to resell "to any railroad or canal company created by the laws of this Commonwealth;" the purchaser to be subject to all contracts made by the Commonwealth.

[Commonwealth v. Pennsylvania Canal Co.]

By the 5th section of the act, the purchasers were authorized to sell or to lease any part of the canals, and any corporation or association, authorized by the act to purchase the whole, may purchase or lease such portions, and hold the same subject to the conditions, and be entitled to all the privileges in the act.

The 2d section of the Act of 1866 provided that the commissioner appointed under the act shall inspect the dams on the Susquehanna, and "if the sluices or other devices shall not then have been made as directed," &c., he shall report them to the district attorney, who shall prefer a bill of indictment, &c., for maintaining a public nuisance ; and by this section the duties of the commissioner were to cease on the first Monday of December 1866. By the 3d section, if the sluices, &c., should not be kept open, &c., the failure should be deemed a misdemeanor, and the dam a public nuisance, &c. On the 1st of May 1866, Pamph. L. 1068, the Pennsylvania Canal Company was incorporated and authorized to purchase from the Pennsylvania Railroad Company, and the railroad company was authorized to sell, all the portion of the main line of the public works from Columbia to Duncan's Island, and the Juniata Canal from Duncan's Island to Hollidaysburg, with all the property and appertenances, &c., for the purposes of navigation, which the Commonwealth granted to the railroad company under the Act of 1857; with "the powers, privileges and franchises granted or intended to be granted," and required the canal company to keep the canal in navigable condition. By the Act of April 13th 1867, Pamph. L. 79,. the provisions of the Act of 1866 were continued until the 31st of December 1867. By the Act of April 9th 1868, Pamph. L. 77, the office of commissioner was extended to December 31st 1868.

The jury returned a special verdict, finding the construction of the canals, &c., by the Commonwealth; also "that the said dam and structure in the indictment in this case mentioned and described, was constructed and erected by said board of canal commissioners, at the expense and cost of the state of Pennsylvania, long prior to the year 1857, to wit, on or about the year 1826, and as one of the necessary works connected with the construction of the Pennsylvania Canal as above provided; and that said dam thenceforth continued and still continues to be used as a part of said canal."

They also incorporated into their finding the foregoing Acts of Assembly, the sale by the Commonwealth of the public works to the Pennsylvania Railroad Company, and their conveyance July 31st 1857. They also found "that in accordance with the powers conferred by the Act of May 1866 the said Pennsylvania Railroad Company, on the 30th day of March, A. D. 1867, sold and conveyed the line of said canal, from Columbia to Hollidaysburg, to said Pennsylvania Canal Company. * * * That James

Worrell was duly appointed commissioner by the governor, as provided by said act and supplement, and entered upon and performed the duties devolved upon him by said appointment, and did, within the time limited and designated in said act, fix and designate the location of the wiers, steps, sluices and other devices for the free passage of fish up and down said river and through the dam and obstruction, in the indictment in this case mentioned and described, and did furnish working plans of the same to the owners thereof, to wit, the defendants herein, and did in all things observe, perform and conform to the provisions and requirements of said act and supplement.

" That said defendants have not hitherto made said sluices, wiers or other devices, or any sluices, devices or ways for the free passage of fish up and down the said river, through said dams and obstructions in the indictment in this case mentioned, according to the plan furnished by said commissioner or otherwise, but that said dam and obstruction remain in the same condition, in all respects, in which it was before the passage of said Act of March 30th 1866, and is an obstruction to the free passage of fish and spawn up and down said river.

" If the court, upon the facts stated, should be of opinion that the defendants are guilty in manner and form as they stand indicted, then we find defendants guilty, and judgment to be given accordingly; if not guilty, the verdict and judgment to be for defendants."

On the 15th of February 1869, Judge Pearson delivered the opinion of the Court of Quarter Sessions on the special verdict.

The opinion was adopted by the Supreme Court, and is as follows :—

" The state of Pennsylvania, about the year 1827, constructed a dam across the Susquehanna river, at Duncan's Island, for the purpose of feeding its canal, then about to be completed, and kept it up to supply the 'public works with water until the year 1857, when the whole right of the state was conveyed absolutely to the Pennsylvania Railroad Company by deed, pursuant to the provisions of the Act of May 16th 1857. That company made use of the dam for the same purpose until it sold and transferred all of its interest in the property, from Columbia to Hollidaysburg, including the dam *now* in dispute, to the Pennsylvania Canal Company, in pursuance of the Act of May 1st 1866, by which that company was incorporated and authorized to make the purchase. The Susquehanna is one of the great rivers of Pennsylvania, navigable by nature, over which the state has exclusive control by virtue of its right of eminent domain. The claims of riparian owners to its shores run no further than ordinary low-water mark, and between that and the high-water boundary, the public has the right of free passage, and the state

[Commonwealth v. Pennsylvania Canal Co.]

the privilege of taking possession at any time without making compensation to the landowner, who has but a qualified property in the intermediate space. See 1 Penna. R. 467; 1 W. & S. 364; 6 Id. 112, 113, 114.

" The dam was therefore the absolute and unqualified property of the Commonwealth, which by its deed, made in pursuance of the Act of 1857, conveyed all of its rights therein to the Pennsylvania Railroad Company on the 31st day of July of the same year. The Act of Assembly authorizing this conveyance is most full and ample, only reserving the power in the state to revoke the grant for misuse or abuse of the privileges granted after a *judicial decree* of such misuse or abuse first duly had and obtained.

" The railroad company to which this sale was made, held a charter from the state, granted in the year 1846, in which there is no power of change or revocation reserved, consequently it was then and still continues beyond and above legislative control. The state has precisely the same power over property granted to a corporation that it has over a like grant to a private individual —no more, no less: 6 How. 533. Thus stood the right to this feeder-dam on the 30th day of March 1866, when the act relating to the passage of fish in the Susquehanna river was passed, under which the indictment in the present case was preferred. The Act of Assembly last referred to, requires every individual or corporation having or maintaining any dam, wier or other obstruction on the Susquehanna and its various branches, including the Juniata river, to maintain and keep up at each of said dams, wiers or other artificial obstructions, a sluice, wier or other device for the free passage of fish and spawn up and down said stream, in such manner and on such plan as a commissioner to be appointed by the governor may devise. Working plans are to be furnished by the commissioner who is to inspect the dam immediately after the 1st of November next following, and if the device shall not have then been constructed as prescribed, the commissioner is to report the delinquency to the district attorney of the proper county, who is to cause an indictment to be preferred against the delinquent corporation or individual. The failure to erect and keep up devices in the dams in the mode prescribed by the commissioner, is declared to be a misdemeanor, and the dam a public nuisance; the violators of the law are subjected to a heavy penalty, and if the work be not completed within thirty days, the dam is to be abated by the sheriff at the cost of the individual or corporation offending. The Pennsylvania Canal Company, under its purchase from the Pennsylvania Railroad Company, made on the 30th day of March 1867, has kept up the dam, and neglected and refused to make the sluices as required by the Act of Assembly, and consequently was indicted at the

[Commonwealth *v.* Pennsylvania Canal Co.]

November Term of court of Dauphin county, and a true bill found on the 21st day of that month.

"A special verdict was taken embracing every fact necessary to raise the legal positions presented on the argument, which we will now proceed to consider. The defendant answers that the statute under which it is indicted was repealed by the Act of April 13th 1867, which provides that the several provisions of the 2d section of the act entitled 'An Act relating to the passage of fish in the Susquehanna river and certain tributaries,' approved March 13th 1866, be and the same are hereby continued to the 31st day of December 1866. On looking into the provisions of the 2d section thus referred to, we find that certain of its enactments expired in effect on the first Monday of December 1866—as the duty of the commissioner for instance. If that officer had failed to fix the width of the wiers, steps or sluices, or determine their location on the various dams, to furnish the working plans on which the sluices were to be constructed, to obtain the approval of the governor thereto, or to inspect the same and report the delinquency to the district attorney, the power on the part of that officer had ceased, and it was the intention of the legislature to prolong it by the Act of 1867. The statute is hastily and carelessly drawn; but by applying its words to the provisions of the Act of 1866 which had expired, we do not infer the absurdity to the legislature of intending to continue provisions which had not expired, to wit, the power to indict or punish for keeping up that which the law declared a nuisance, and concerning which the enactment is perpetual. It is our duty to so construe the laws as to prevent an absurdity. This can readily be done in the manner indicated, and such is the obvious meaning of the act. Apply the maxim *reddendo singula singulis*, and the two laws may well stand together. Had the act expired as assumed, the legal position that the indictment must fall would have been clearly tenable, for if the law expires or is repealed before indictment, there can be no prosecution, or if after conviction sentence cannot be pronounced. It is scarcely necessary to cite authorities for so plain a position; but we find them in 1 Binn. 601; 1 Whart. 460; 1 Wash. C. C. R. 84; 10 Watts 351; 8 Smith's N. Y. R. 95. It is also urged that as this law is highly penal in its character, it must be strictly construed, and is *ex post facto* in its operations, punishing that which was lawful at the time it was passed. This statute does not pretend to punish the defendant for erecting the dam, it was lawfully built by the state, and kept up by it and the Pennsylvania Railroad Company for nearly forty years before this defendant had existence as a corporation. The law does not declare the *erection* unlawful, but forbids the keeping up of the work after the owner has been furnished by the commissioner with the plan devised for the passage of fish without making the

[Commonwealth *v.* Pennsylvania Canal Co.]

sluices, &c., as required by the statute. It is the failure to make the change after due notice which is declared to be a public nuisance, and keeping up the dam in contravention of the legislative command.

" It is said that the Act of Assembly is in violation of the state and national constitutions in this : That it impairs the obligations of a contract, between the state and the Pennsylvania Railroad Company, entered into when the state sold its works ; violates the charters, both of that and the Canal Company, by imposing burdens on them, which neither their charters nor the laws of the land require them to bear, and takes private property for public use, without paying or securing any equivalent. To this it is answered by the Commonwealth that, as the Susquehanna was by nature a public navigable river, the people on its banks had an inherent right of free fishing, which could not be impaired or taken away. That the state possesses the right of eminent domain for the benefit of the people, and cannot part with, sell or abandon it. A charter granted to a corporation is of no greater efficacy, or of more binding obligation, than a deed to an individual ; and its franchises are subject to the power of eminent domain, and are under the control of the legislature ; that there is no taking of this property ; and even if taken, it does not impair the contract. The point mainly relied on in response to the defence is, that this law is an exercise of police power, which the state possesses over all persons or property within its borders, is held for public benefit, and cannot be parted with or abandoned ; and lastly, that the exercise of the right complained of is not a violation of the words of the constitution, and before a law can be declared void by the courts on account of impinging with the organic law, it must be clearly so, and come within the prohibition of the very letter. It would be a waste of time, at this day, to argue that a grant is a contract executed, and the property once granted cannot be resumed by the state, without the consent of the grantee. It is equally useless to cite authority to prove that the charter of a corporation cannot be revoked, or altered, against its consent, unless when the power of revocation or alteration is reserved in the grant, in general laws previously passed and applicable to their incorporation, or in the constitution itself. If the state has in the mode prescribed by law granted a tract of land to an individual for a valuable consideration, it cannot, by law, revoke the grant and resume the property ; and even when taken for necessary public purposes, must pay the owner a full equivalent. The same rule applies, both to the franchises and property of a corporation. In the present case the state, for a full and valuable consideration, granted and conveyed its canal and railroad improvements to the Pennsylvania Railroad, a corporation over the charter of which it had retained and possessed no control whatever. That company

had held and enjoyed the property for about nine years, when the Act of 1866, relating to the passage of fish, was passed.   By that law the legislature attempted to impose on this company the burden of changing all its dams, from and including the one in controversy, up to, and along the Juniata to Hollidaysburg, so as to secure the free passage of fish through all the dams; some twenty-six in number; and the expense of making the directed alterations, it is said, will amount to over $200,000, independent of the cost of keeping them in repair.   These alterations in the dams, it will be borne in mind, are not for the benefit of the present owner, which will, it is said, be greatly injured thereby in the loss of the necessary supply of water for its canal, but is intended for the benefit of the people at large, and the riparian owners in particular, by securing an abundant supply of fish.   We would naturally conclude that in such a case the expense of these alterations should rather be borne by the public at large, or the persons who are to be especially benefited, than by the purchaser for value, who is to receive no benefit, but will be essentially injured by the change. It is said, however, that there is no taking of the property of this corporation under the statute, and therefore it cannot claim the protection of the constitutional prohibition.   Although the dam in question is not taken, the money of the owner must be to a very considerable amount before the alterations and improvements required by the statute can be completed.   It transcends the power of the legislature to throw such a burden on its grantee. When the legislature incorporated a company to make a bridge with a draw of 30 feet, it was decided to transcend the power of the legislature to require the draw to be extended to 50 feet: 18 Conn. R. 54.   Also held that a railroad company could not be obliged to make bridges for county roads across their track when the charter contains no such obligation: 2 Barb. 513.   Franchises cannot be changed without the consent of the corporators, properly expressed.   The legislature cannot interfere with corporate property or franchises: Brown *v.* Hummel, 6 Barr 86.   When no power is reserved for the legislature to alter the charter it cannot be done, nor can additional burdens be thrown on it without the consent of the corporators: Commonwealth *v.* The Monongahela Nav. Co., 6 Barr 379.   See also Harrington's Rep. 389, 9 Cranch 292; Dartmouth College *v.* Woodward, 4 Wheat. 518, and numerous other cases.   But wherefore investigate these decisions when we have an authoritative exposition of the constitutional power of the legislature, made in a very recent case by our Supreme Court, which is binding on us as an inferior judicial tribunal, and which we have neither the legal power nor inclination to disregard.

" The state of Pennsylvania, some years since, donated the canal extending from the mouth of the Beaver to the city of Erie to a company incorporated to receive, complete and keep it up.   The

[Commonwealth *v.* Pennsylvania Canal Co.]

charter required the company to maintain farm bridges; but no mention was made of those on the public streets and highways. The state had built, and was accustomed to keep up those bridges. Some in the borough of Meadville fell into decay and were rebuilt by the town authorities, which sued the canal company for the expense thereof; but it was decided that the corporation law did not require it to keep up these bridges. See Meadville . *v.* Erie Canal Company, 6 Harris 66. In 1864 an act was passed requiring the company to build and keep up the bridges on the public streets and highways; which the corporation refused to do, and was sued by the city of Erie for the expense incurred in rebuilding those in that city. But it was held by Derickson, J., on full consideration in the Court of Common Pleas, that the legislature had transcended its power in passing the law; and the judgment was affirmed by the unanimous opinion of the Supreme Court, in a most lucid argument by Sharswood, J., see The City of Erie *v.* The Erie Canal Company, 9 P. F. Smith 174. That was a vastly more favorable case for the exercise of legislative power than the one before us. There the state had originally built all of the bridges on the streets and highways, including those in question, and had always kept them up. The canal was *given* to the company by words of equivocal meaning, but probably intending to bind the company to do the same thing, but not so expressed. Here the public works of the state were sold to the Pennsylvania Railroad Company for $7,500,000. The dam was built, and had always been kept up by the Commonwealth, without any sluice, causeway or other device for the passage of fish, as had all of those embraced in the Act of 1866, which the railroad company was required to change at its expense. There was an apparent fairness in the law relating to the Erie Canal, as it only required the donee of the state to do what the donor had always done whilst it held the property. There is nothing but unmitigated hardship and injustice in the Act of 1866, which obliges a purchaser, for value, to do what the vendor had never done when it built, or whilst it owned and kept up the dams by virtue of its sovereign power. The purchaser had a right to expect it would be permitted to use and enjoy the works as they had always been held and enjoyed by the state, without expense or molestation by the legislative authority. It is said, however, that the state can cause the dams on the river and its branches to be changed or even vacated by virtue of the right of eminent domain, an attribute of sovereignty vested in every government for the benefit of the people, and which can neither be parted with or abridged. There is no doubt of the power of this Commonwealth over the public rivers within its borders, and it was by virtue of its sovereignty that it took possession of the Susquehanna, the Juniata and other streams, and obstructed them with dams for what it considered the

16 P. F. Smith—4

benefit of the people, although thereby the passage of fish was prevented, and the fisheries destroyed. But it also sold the whole works for what was considered the public good. The dams became, after such erection and sale, private property, and if now taken under the power of eminent domain for public use or benefit, it must be done on paying the owner an equivalent.

" The present law proposes nothing of the kind, but on the contrary requires the corporation to make all of the changes and keep them up at its own expense. This transcends sovereign power. It is prohibited by the constitution. The state might as well undertake by legislation after it had parted with its land to A. for a full consideration, and conveyed it in all the forms of law, to transfer it over to B., and compel A. to make a conveyance, or after it had thus parted with its property, oblige A. to build a church or school-house for public benefit on the land at his own expense. One of the highest attributes of sovereignty, and most essential to the existence of the state, is the power of taxation, yet that may be released for a consideration, and cannot be resumed without the consent of the grantee. See New Jersey *v.* Wilson, 7 Cranch 164; Gordon *v.* Appeal Tax Court, 3 How. 133; Bank *v.* Knoop 16 Id. 369; Id. 416–432, and many others to the same effect. This is the settled law as declared by the highest judicial tribunal in the country—the Supreme Court of the United States.

" It is further contended that the state can compel the holder of these dams to fit them for the passage of fish by virtue of its police power; the alteration being of great public benefit and necessary for the welfare of the people. This power is very extensive in preventing nuisances of almost every kind, as removing noisome smells, offensive trades, dangerous explosive substances, that which is deleterious to health, or dangerous to the lives of the people. The interment of the dead in a great city has been forbidden, although the corporation was expressly created for that purpose, and endowed with the authority to use the location: Coates *v.* The City of New York, 7 Cow. 585. Every right is granted under the implied condition that it shall not injure others: Id. 605. It has been held in several of the states that a railroad company could by law be obliged to fence its road, although no such power was retained in the words of its charter, the same being necessary for public safety and that of the neighboring stock running at large. See 12 Indiana 3; 16 Id. 84; 27 Vermont 140. The corporation was subject to police regulations, and may be obliged to enclose its track under the penalty of paying for all cattle killed or injured: 25 Illinois 140; 28 Id. 284–290. The road takes nothing by inference or intendment, and may be obliged to do whatever the public good requires unless expressly exempt by its charter: 27 Vermont 140.

" The right of control over the waters of the state has perhaps

been carried further as a police power in the state of Massachusetts than in any other, where the common law prevails, and that whether the franchise was in the hands of an incorporated company, or the property and privileges were claimed by a private individual. The common law may have been changed to some extent by early custom, or the power over the streams of water secured to the public by provincial legislation; for we find it decided as early as 4 Mass. 528, that where permission was given to the owner of land to build a mill, as early as 1633, and he was granted a several fishery, the legislature could require him, after the expiration of a hundred years, to make a passage for the fish, and when badly done to rebuild it at the expense of the owner.    The whole subject underwent careful examination in The Commonwealth v. Alger, 7 Cush. 53, 101.    It was held that the right of free fishing and navigation was a public right, and could be controlled by legislation, although private rights were injuriously affected (see also 4 Pick. 460, 462; 5 Id. 199), and a man may be prohibited from moving timber or gravel from his own land, if by its removal the public is likely to be injured; although by such prohibition the land is greatly lessened in value: 4 Met. 55.    On the other hand, it was decided in Virginia, that when permission was given to an individual to erect a dam, in the mode prescribed by law, which was done, and long enjoyed, that it transcended the power of the legislature to compel the owner, at a late day, to erect a lock therein for the passage of boats at his own expense: 6 Randolph 245, considered with great care.    So in the state of New York, The People v. Platt, 17 Johns. 195, where land was granted covering a stream not naturally navigable, the legislature cannot impose burdens on the owner of a dam erected thereon before the passage of the law declaring it a highway, without making or providing for compensation.    It is impairing the grant, which is in violation of the contract.    If a private stream is made navigable, the legislature cannot appropriate it to the public without compensation, Angell on Watercourses 601, § 539, 27 Fairfield (Maine) 81, and after granting it to an individual, cannot divest his right, without compensation, by declaring it a highway.    It has long been considered the law of Pennsylvania, that when the line of survey runs across streams of water, and the owner of the land erected a mill-dam on the stream, he could keep it up without molestation after the legislature had declared the creek or river a public highway, and the owner could not be obliged to fit his dam for the passage of boats and rafts; but if done, it must be at the public expense. Such owner might as well be required to remove bars, rocks or drift-wood for the convenience of navigation, by virtue of the police power, as to fit up a dam so erected.    The case has been likened to that of paving and side-walks in cities, or opening streets at the expense of lot-owners; all of which has been sus-

[Commonwealth *v.* Pennsylvania Canal Co.]

.tained by our courts, see Schenley *v.* The City of Allegheny, 1 Casey 128, also 3 Watts 592, or compelling a borough to pay more than its proportion towards the erection of a court-house: 7 Harris 258. But it must be borne in mind that in each of these cases the owner was benefited or supposed to be, and therefore payment was lawfully enforced.

" The legislature professes, and has always exercised, unlimited control over municipalities, and the citizens thereof who, by uniting with larger bodies, bring themselves and their property under management for the benefit of the whole. As we understand the police power of the state, which has been strongly pressed upon us as being unlimited and uncontrollable, and which no state can part with, it is nothing more than the authority to compel all owners of property so to use their own as not to injure others; that therefore the state cannot, by contract or otherwise, part with the power to compel the owner of real estate so to use it as not to endanger the public health or safety. This is, perhaps, the extent to which writers on that subject press the doctrine. See Cooley's Const. Lim. 282–3; Id. 276, 7, 8. But if it can be invoked for the purpose of enabling a state to revoke its grant, violate its contract, or take the property of an individual for public or private use, without making compensation, it is a most dangerous power, and enables the legislature to do that which is expressly forbidden by the Constitution. Our only reason for examining the subject at such length is, that the authority has been strongly pressed, and it has been urged that the exercise of the power has never been presented to or commented on by the courts of our state in any of the decided cases. We are well aware that no law can properly be declared unconstitutional unless it clearly violates the provisions of the organic law. But, as we understand this enactment, it takes the property of this corporation, defendant, for public use, without paying any equivalent, and clearly alters the character of the contract made with the railroad company at the time of the sale; in legal effect, violates the contract, and changes the charter of the company to which it sold; an act which transcends its power. It is very true that the present defendant was incorporated since the amendment of the Constitution, which gives the legislature the power to change and modify the charters of incorporate companies at its pleasure, provided, in its opinion, no injustice will be done to the corporators. But it will not be pretended that the legislature, by the Act of the 30th of March 1866, undertook to construe or modify the charter of the Pennsylvania Canal Company, which had no legal existence at the time, but was incorporated on the 1st of May 1866, and secured a transfer of the works from the railroad company on the 30th day of March 1867. The whole Act of Assembly, in relation to the passage of fish, is aimed at the railroad

company, over the charter of which the legislature had no control whatever.

"We are aware that our decision will be a great disappointment to the people who ardently desire, and fully expected an ample supply of fish by the change of these dams. We are of the opinion that the alteration can be made if the same is deemed useful, but it must be done at the public expense; the defendant cannot be obliged to bear the burden. It is our duty to declare this act null and void, so far as it imposes on this company the duty of changing the dams at its own proper cost; and we therefore render judgment in favor of the defendant on the special verdict."

The Commonwealth sued out a writ of error, and assigned for error the entering of judgment for the defendants.

*J. W. Simonton* and *F. C. Brewster*, Attorney-General (with whom was *R. L. Muench*), for plaintiff in error.—Did the railroad company, by their purchase and deed, take the right to sell said works to the Pennsylvania Canal Company, the defendant in this case? A grant of land or of a corporate franchise by an act of legislation is a contract, the obligation of which a subsequent legislature cannot impair: Southwark Railroad v. Philadelphia, 11 Wright 314; Iron City Bank v. Pittsburg, 1 Id. 340. This being admitted, what was the contract of the Pennsylvania Railroad Co., with the Commonwealth?

Any ambiguity in the contract operates in favor of the public: Charles River Bridge v. Warren Bridge, 11 Peters 544; Susquehanna Canal v. Wright, 9 W. & S. 11; Monongahela Nav. Co. v. Coon, 6 Id. 113. A corporation takes nothing by its charter except what is plainly, expressly and unequivocally granted: Bank of Penna. v. Commonwealth, 7 Harris 155; Commonwealth v. Erie and N. E. Railway Co., 3 Casey 359.

The defendants were incorporated after the passage of the Fish Act, and therefore took subject to its obligations: Armstrong v. Treasurer of Athens Co., 16 Pet. 281. Corporations are subject to the provisions of general laws in force at the time they obtain their charters: Pratt v. Atlantic and St. Lawrence Railroad, 42 Me. 597; Bowen v. Sears, 5 Hill 221; Bank v. Nolan, 7 How. (Miss.) 508; Bank v. Archer, 8 Smedes and M. 151; Coffin v. Rich, 45 Me. 507. And to general laws passed subsequently, not conflicting with the clearly expressed or necessarily implied provisions of their charter: Easton Bank v. The Comm'th., 10 Barr 442; Providence Bank v. Billings, 4 Peters 514; Iron City Bank v. The City of Pittsburg, *supra;* Norris v. Androscoggin Railway, 39 Me. 293; Railway v. Smith, 37 Id. 35; English v. N. H. and Northampton Co., 32 Conn. 240; Monongahela Nav. Co. v. Coon, 6 Barr 379.

[Commonwealth *v*. Pennsylvania Canal Co.]

The obligation of a contract depends upon the laws in existence when it is made: McCracken *v*. Hayward, 2 How. 612; Ogden *v*. Sanders, 12 Wheat. 259; Pomeroy's Const. Law 382–8; Cooley's Const. Law 285–6. To declare an act void it must clearly, palpably and plainly violate the Constitution: Sharpless *v̇*. Philada., 9 Harris 164. The Fish Act is a proper and legitimate exercise of the police power of the state: Thorpe *v*. Rutland and Burlington Railroad Co., 27 Vt. 149; Railway Co. *v*. Gilliland, 6 P. F. Smith 452. The right of free fishery, which is vested in all the inhabitants of the state, is of such importance and value to the health and prosperity of the citizens of the state at large, as to bring it within the class of rights which may be defined and protected by this police power. The right to fish in such rivers as the Susquehanna and Delaware belongs to the public: Carson *v*. Blazer, 2 Binn. 475; Shrunk *v*. Nav. Co., 14 S. & R. 71; Moulton *v*. Sibley, 37 Maine 472; Denham *v*. Lamphen, 3 Gray 268; Hart *v*. Hill, 1 Whart. 132; Angell on Watercourses, § 86; Comm'th. *v*. Tewksbury, 11 Metcf. 55; Coates *v*. The Mayor, 7 Cow. 585; Brick Church *v*. The Mayor, 5 Id. 538; Cooley's Const. and Stat. Lim. 579, 580, 597; Gilman *v*. Philad., 3 Wall. 730.

*L. W. Hall* and *F. Jordan*, for defendants in error.—The 2d section of the Fish Act, that under which the indictment was found, had expired before judgment, and no further proceedings can be had: Road in Hatfield Township, 4 Yeates 392; United States *v*. Passmore, 1 W. C. C. R. 84; North Canal Street Road, 10 Watts 351; Stoever *v*. Immel, 1 Id. 258; Commonwealth *v*. Duane, 1 Binn. 601; Comm'th. *v*. King, 1 Whart. 448; Hastings *v*. The People, 8 Smith (N. Y.) Rep. 95.

The canal company assumed the same duties and responsibilities as the railroad company, and no others: their charter is a contract with the state, not subject to alteration by the latter, so as to deprive them of the rights secured by it: Pierce on Am. Railroad Law 20; Monon. Nav. Co. *v*. Coon, 6 Barr 381; Erie & N. E. Railroad Co. *v*. Casey, 1 Grant 275; Comm'th. *v*. Cullen, 1 Harris 133; Brown *v*. Hummel, 6 Barr 86; Terrett *v*. Taylor, 9 Cranch 43; Calder *v*. Bull, 3 Dall. 386; City of Erie *v*. The Erie Canal Co., 9 P. F. Smith 174. The Fish Act takes private property for public use, without compensation: Angell on Watercourses, §§ 457, 8, 9, &c.; Redfield on Railroads 555–6; Pierce on Am. Railroad L. 38; 2 Kent's Com. 408–9; Cranshaw *v*. The Slate River Co., 6 Rand (Va.) Rep. 245; Washington Bridge Co. *v*. The State, 18 Conn. Rep. 53; Miller *v*. The N. York and Erie Railroad Co., 21 Barb. Rep. 513; Bell *v*. The Ohio and Penna. Railroad Co., 1 Grant 105; Erie *v*. The Erie Canal Co., *supra*; Comm'th. *v*. Reed, 10 Casey 275; Cooley on Constitutional Lim. 577, 578.

[Commonwealth v. Pennsylvania Canal Co.]

The opinion of the court was delivered, July 7th 1870, by

SHARSWOOD, J.—The very able and exhaustive opinion of the learned president judge of the court below in entering judgment upon the special verdict, relieves us from the necessity of any further discussion of the important constitutional and legal questions involved in this case. That opinion is in entire accordance with our own views, and we adopt it as the opinion of this court.

It is strongly urged, however, on behalf of the Commonwealth, and this has been the principal contention here, that he fell into a fundamental error, which vitiated all his reasoning, by treating the case as though it were a question between the Commonwealth and the Pennsylvania Railroad Company, who were the original purchasers of the dam at Duncan's Island, together with the other public works, under the provisions of the Act of Assembly, passed May 16th 1857, Pamph. L. 519, entitled "An Act for the sale of the main line of the public works." It is apparently conceded that the Pennsylvania Railroad Company took the works under that act by contract, and paid for them to the state a valuable consideration, and consequently the state could not impose upon their grantee any new burthen not contained in the original sale; for that would be for one of the parties to add a new term or condition to the contract. In that respect the case is stronger than The City of Erie v. The Erie Canal Company, 9 P. F. Smith 174, for the Erie Canal Company was the donee rather than the vendee of the Commonwealth. But it is said, that by the Act of 1857 the Pennsylvania Railroad Company were not authorized to sell any part of the works to the Pennsylvania Canal Company, because, at the time of the original sale of the whole, it was not then an existing corporation, and consequently, when the last-named company were incorporated by the Act of May 1st 1866 (Pamph. L. 1068), and were thereby authorized and empowered to purchase, take and hold from the Pennsylvania Railroad Company, and which said railroad company were thereby authorized and empowered to grant, the canal from Columbia to the junction at Duncan's Island, &c., with all the property and appertenances thereto appertaining, they necessarily took the same under and subject to the provisions of the previous Act of Assembly of March 30th 1866, Pamph. L. 370, entitled "An Act relative to the passage of fish in the Susquehanna river and certain of its tributaries," for a violation of which this indictment was preferred. The argument has great ingenuity and plausibility, and if its premises be admitted, the conclusion would have to follow logically and inevitably. All legislative acts alienating public rights or domain are to be strictly construed, and no such grant is to be inferred by implication merely. Accepting this as not only the well established, but sound and reasonable canon of construction, let us examine how it applies in the case before us; whether there is not here a sufficient actual expression to be beyond the reach of

[Commonwealth *v.* Pennsylvania Canal Co.]

the rule.  By the third section of the Act of 1857, it was pro-
vided, " that it shall be lawful for any person or persons, or railroad
or canal company now incorporated or which may hereafter be
incorporated by and under the laws of this Commonwealth, to
become the purchasers of the said main line of the public works."
Then, after various provisions, applicable specially and severally
in case individuals or associations of individuals, or the Pennsyl-
vania Railroad Company, should become the purchasers; and
directing in the fifth section, that immediately after the said pur-
chaser or purchasers, or their assignee, shall take possession of
the same, the said purchaser or purchasers, or assigns, shall be
bound ever thereafter to keep in good repair and operating con-
dition, the main line of said railroad and canal, extending from
Hollidaysburg to Philadelphia, &c.; it is added in these words:
" Provided that said purchasers be authorized to grant, sell and
convey, or to lease for a term of years, upon such conditions as
may be agreed upon, any part or portion of said canals, and any
corporation or association of individuals, authorized by this act to
purchase the whole, may purchase or lease such portions and hold
the same subject to the conditions and entitled to all privileges
contained in this act."   As by the third section any corporations
thereafter to be incorporated were entitled to become purchasers
of the whole, it would seem at first blush to follow by the express
words that such corporations would also be authorized to become
sub-purchasers or lessees of part.   But it is maintained, and here
is the stress of the argument, that by the third section it was only
meant that corporations, which should be incorporated between
the date of the act and the sale, should become purchasers; for
how in the nature of things, it is asked, could a corporation pur-
chase, which was not in existence at the time of the sale?   By a
necessary inference, a corporation not in existence at the time of
the sale could not become a purchaser of a part under the fifth
section.   The argument is more refined than solid.   We must
bear in mind that an established canon of construction is that
*verba relata hoc maxime operantur per referentiam ut in eis inesse
videntur*.   If, in pursuance of this rule, we transfer the words of
the third to the fifth section, they must then receive the same
construction, which it is conceded that they have in the third sec-
tion, so as to authorize a sale to any corporation created after the
passage of the act and before the sale or lease mentioned in the
fifth section.   That this was really the mind of the legislature can
hardly be matter of doubt with any one who reflects upon the
circumstances of the case.   That body cannot fail to have per-
ceived that the only really practicable mode by which a sub-sale
or lease of part of a work of that character was likely to be
effected would be by some corporation specially to be created for
the purpose, just as they evidently did see the same thing in the
provision made for the original sale of the whole.   It was highly

[Commonwealth *v.* Pennsylvania Canal Co.]

improbable that any corporation existing at the time of the original sale, could, consistently with its charter, unless incorporated expressly for the purpose, become a sub-purchaser. The Pennsylvania Canal Company, incorporated May 1st 1866, and specially authorized, as we have seen, to purchase from the Pennsylvania Railroad Company, became their assignees under and by virtue of the original power to sell, contained in the Act of 1857, and of course took the subject of the grant with all the privileges thereby conferred upon them. Nay, the terms of the Act of Incorporation, May 1st 1866, seem intended to leave no possible doubt upon this point, for it declares that they shall be vested "with all the powers, privileges and franchises granted or intended to be granted" to the Pennsylvania Railroad Company. And this is again repeated: "And the said Pennsylvania Canal Company, their successors and assigns, be and they are hereby vested with the said powers, privileges and franchises." They became, thereby, the assignees of the Pennsylvania Railroad Company, and stood in their shoes to all intents and purposes as parties to the contract authorized by the Act of 1857. The learned president judge below, therefore, fell into no error in treating the case as though it was a question between the Commonwealth and the Pennsylvania Railroad Company.

The franchises conferred upon the Pennsylvania Railroad Company, and vested in the Pennsylvania Canal Company, as their assignees, on this great public highway, are undoubtedly still within the right of eminent domain of the state, and may be resumed or taken under the limitation of Art. IX, sect. 10, of the Constitution, "nor shall any man's property be taken or applied to public use without the consent of his representatives, and without just compensation being made:" West River Bridge Company *v.* Dix, 6 How. (U. S.) Rep. 507; Commonwealth *v.* Pittsburg and Connellsville Railroad Company, 3 P. F. Smith 50.

Judgment affirmed.