[S. F. 2048.   In Bank.—October 23, 1899.]

M. F. FRAGLEY, Appellant, v. JAMES D. PHELAN et al., Respondents.

FREEHOLDERS' CHARTER OF SAN FRANCISCO — VALIDITY — INJUNCTION — ELECTION UNDER CHARTER. — The recently adopted freeholders' charter of the city and county of San Francisco is valid, and was constitutionally adopted; and the board of election commissioners and other municipal officers thereof cannot be restrained by injunction at the suit of a taxpayer from the expenditure of public moneys for the conduct of an election held in the city and county of San Francisco in pursuance of such charter.

Id.—Constitutionality of "Charter Election Act."—The act of 1897, called the "charter election act," in relation to elections held under section 8 of article XI of the state constitution, to elect boards of freeholders, or to vote upon proposed charters, et cetera, does not violate section 6 of that article, and is not special legislation or wanting in uniformity of operation, but is constitutional and valid. [Per Garoutte, J., Van Dyke, J., and McFarland, J.]

Id.—Construction of Constitution—"Municipal Affairs"—Charter Elections.—The election of a board of freeholders to frame a charter, and the election at which a vote is had to confirm the charter, are not "municipal affairs" within the meaning of the exception to section 6 of article XI of the constitution, and such elections may be subject to and controlled by a general law. [Temple, J., dissenting.]

Id.—Meaning of "Municipal Affairs."—"Municipal affairs," as those words are used in the organic law, refer to the internal business affairs of a municipality; and the constitution indicates that there is a large amount of legislation pertaining to cities and towns which does not come under the classification of "municipal affairs." [Per Garoutte, J., Van Dyke, J., and McFarland, J.; Temple, J., dissenting.]

Id.—Distributive Construction—Silence of Charter.—Section 6 of article XI of the constitution is to be construed distributively, as applying to "any city or town, et cetera, except in its municipal affairs," et cetera, and as allowing the municipality to be controlled by general laws in all municipal matters in respect to which the provisions of its charter are silent. [Per Harrison, J., Beatty, C. J., and Henshaw, J.; Temple, J., dissenting.]

Id.—Charter Elections in San Francisco—Power to Consolidate Election Precincts—Operation of Political Code.—The special act of 1878 regulating elections in San Francisco is superseded to the extent of its inconsistency with subsequent amendments of the Political Code, by the operation of section 6 of article XI of the constitution; and under the amendments of sections 1127 and 1129 of the Political Code, the board of election commissioners of San Francisco had authority to consolidate established election precincts for the purposes of the election of a board of freeholders, and of the election to vote upon the charter framed by them. [Per Harrison, J., Beatty, C. J., and Henshaw, J.]

Id.—Precinct Registration—Special Elections—Regulations of Election Commissioners.—The act of 1878 does not provide for or authorize precinct registration at special elections; and any required changes in the precinct registers for a special election may be had at the office of the registrar, under the regulations of the board of election commissioners. The rights of the registered voters are subject to the power of the election commissioners to consolidate precincts and to change polling places for a special election. [Per Harrison, J., Beatty, C. J., and Henshaw, J.]

Id.—OFFICERS OF ELECTION—OMISSION OF ELECTION COMMISSIONERS—
HARMLESS IRREGULARITY.—The omission of the election commis-
sioners to appoint as many officers of election as they were au-
thorized to appoint does not authorize the election to be set
aside, where the irregularity is not shown to have had any ef-
fect upon the election in any manner. [Per Harrison, J., Beatty,
C. J., and Henshaw, J.]

Id.—APPROVAL OF CHARTER BY LEGISLATURE.—The approval of the char-
ter of San Francisco by the legislature is conclusive of its va-
lidity. [Per Temple, J.]

APPEAL from a judgment of the Superior Court of the City
and County of San Francisco and from an order denying a new
trial. J. M. Seawell, Judge.

The facts are stated in the opinions.

A. Ruef, Thomas V. Cator, E. S. Pillsbury, and John Garber,
for Appellant.

Franklin K. Lane, H. N. Clement, Garret W. McEnerney,
and J. Richard Freud, *Amicus Curiae*, on behalf of the Mer-
chants' Association of San Francisco, for Respondents.

GAROUTTE, J.—This is an action brought by a taxpayer
for an injunction against the board of election commissioners
and other municipal officers of the city and county of San Fran-
cisco to restrain the expenditures of certain public moneys for
the conduct and carrying on of an election in said city and
county. The primary and direct purpose of the litigation is to
test the validity of the new charter of the city and county of
San Francisco, which is to take effect January 1, 1900.

The state legislature of 1897 placed upon the statute books
an act which may be called "the charter election act." It is
entitled, "An act in relation to elections held under the au-
thority of section 8 of article XI of the constitution to elect
boards of freeholders, or to vote upon proposed charters or upon
amendments to existing charters." The election to secure a
board of freeholders in this city to draft a charter, and the
election subsequently held to ratify the action of that board
of freeholders, were held under the aforesaid act. The manner
of holding and conducting those elections, while in strict con-
formity with the act, was widely at variance with the provisions

of the general law as to the manner and conduct of holding elections in the city and county of San Francisco; and it is now claimed that these elections as held were absolutely void by reason of the unconstitutionality of the statute under which they were held, and that the elections being void, therefore the new charter is a void and barren instrument.

The parties now attacking the constitutionality of this act of the legislature rest the entire results of the litigation upon that attack, conceding in open court that they have no case if that statute be a valid and constitutional law. They insist that the act is unconstitutional in this, that it is violative of section 6 of article XI of the constitution of the state. That part of section 6, article XI, of the constitution here directly involved reads: "Cities and towns heretofore or hereafter organized, and all charters thereof framed and adopted by authority of this constitution, except in municipal affairs, shall be subject to and controlled by general laws." It is now claimed that these two elections to which reference has already been made were "municipal affairs" within the meaning of the constitution, and, therefore, not subject to and controlled by general laws. In this connection it is then claimed that said act of 1897 is a general law attempting to deal with and control "municipal affairs," and for that reason violative of this constitutional prohibition. As a second contention it is asserted that this statute is special legislation, and also lacking in uniformity of operation. We at once pass to an examination of these constitutional objections.

The solution of the questions thus presented largely revolves around the meaning of the words "except in municipal affairs," as these words are used in the constitution of the state. The phrase formed by these words has a meaning, and a most significant one. This is apparent when we pause a moment to consider that this single phrase forms the subject matter of an amendment to the constitution of the state. The relationship existing between a state and its municipalities is so close that it may be said every city ordinance and every state statute is a matter of interest to both state and municipality. It may be said that all state affairs are a matter of substantial interest to the municipality, and that likewise all municipal affairs are a

matter of concern to the state. Yet those interests are inci-
dental and indirect, and the meaning of this phrase necessarily
takes a narrower scope. Indeed, in the very wording of the con-
stitutional provision itself we find that all matters of legisla-
tion pertaining to and bearing upon municipalities do not come
within the signification of the words "municipal affairs," as used
in the constitution. A mere glance at the provision demon-
strates this fact. The constitution provides that cities and
towns, "except as to municipal affairs," shall be subject to and
controlled by general laws. It is here plainly indicated that a
vast amount of legislation pertaining to cities and towns does
not come under the classification of "municipal affairs."

For the purpose of getting at the true significance of these
words, there is no brighter light to be shed upon them, than is
disclosed by a consideration of the reasons which moved the leg-
islature to propose the amendment, and the people to adopt it.
What was the evil to be remedied? What was the good to be
gained by this amendment? The answer is common, every-day
history. It was to prevent existing provisions of charters from
being frittered away by general laws. It was to enable muni-
cipalities to conduct their own business and control their own
affairs to the fullest possible extent in their own way. It was en-
acted upon the principle that the municipality itself knew better
what it wanted and needed than did the state at large, and to
give that municipality the exclusive privilege and right to enact
direct legislation which would carry out and satisfy its wants and
needs. These are a few of the reasons which gave occasion for
this concise, but all-significant, amendment to section 6 of ar-
ticle XI of the constitution of the state. This amendment,
then, was intended to give municipalities the sole right to regu-
late, control, and govern their internal conduct independent of
general laws; and this internal regulation and control by muni-
cipalities comprise those "municipal affairs" spoken of in the
constitution.

Municipal affairs, as those words are used in the organic law,
refer to the internal business affairs of a municipality. It was
the internal business affairs of municipalities then existing and
those of municipalities to be hereafter created that the constitu-
tional amendment was framed to meet. There is no sound rea-

son why freeholders' charters should not be framed and ratified under general laws. There are a multitude of sound reasons to be urged why the conduct and procedure of elections for the election of freeholders and ratification of charters should be held under general laws. No sound policy exists demanding special legislation upon such a subject matter. As far as there has been given us light to see, neither the legislature nor the people ever thought of such a thing as the adoption of charters when they placed the words "municipal affairs" in the organic law. In defining the phrase "county affairs" the court said in *Hankins v. Mayor,* 64 N. Y. 22: "County affairs are those relating to the county in its organic and corporate capacity, and included within its governmental or corporate powers." Tested by this rule elections held as preliminary steps toward the creation of a freeholders' charter are not municipal affairs.

The city and county of San Francisco is a municipality. The municipal affairs of this municipality are a multitude, covering its business transactions. These business matters are the municipal affairs of the present municipality, but the drafting and ratification of a new charter is not one of its business matters. The conduct of the present municipality's business affairs has nothing to do with the question of the creation of a new municipality. The new municipality will have municipal affairs of its own after it is created and not before. The old municipality performs its functions when it carries on the business intrusted to it. As a municipality it has no voice in saying whether or not there shall be a new charter. In that matter it is wholly passive. If its inhabitants say to it, "Stay with us yet awhile," it stays. If they say: "Your days are ended; you have outlived your usefulness, stand aside," it makes no protest. The decree of the people is its will. A municipal affair pertains to something which may be done by the municipality. The creation of a new charter is a matter not placed in the hands of the municipality, but in the hands of the inhabitants thereof with the consent of the state.

As the legislature alone has the power to approve a charter, it inherently, in the absence of constitutional prohibition, must have the power to prescribe the terms, conditions, and mode upon which it will give its approval; and, if an election is made

necessary by the constitution as a condition precedent to the validity of the charter, the legislature has the power to say what shall be the nature of that election, and how it shall be conducted. And such power gives it the right to say how many voting precincts shall be used upon election day, and what shall be the manner and time for registration.

Viewing this question from another angle, it seems that the creation of a charter is not essentially and alone a municipal affair. It is a state affair, and that fact is recognized in unmistakable terms by the state when the constitution demands that the state legislature approve the instrument by a majority vote; and until such approval it has no life. Notwithstanding all the people of the municipality with a single voice may ask for a new charter, yet the state, by and through its legislature, may deny that request. The legislature stands as the representative of the sovereign power of the state, and has the arbitrary right to grant or refuse charters to municipalities. A grant of a charter to a municipality is a grant of so much power. It is a delegation of a certain amount of power to the municipality theretofore vested in the state. It is a parting with a portion of its sovereignty. It is for this reason that the state, through its legislature, must breathe into the charter the breath of life; and if the state withhold its breath such action is beyond all review. When the constitution vested this omnipotent power in the legislature, it would seem that the framers of that instrument deemed the creation of a municipal corporation a state affair of the greatest import.

In speaking to the general principle here involved Judge Cooley says in *People v. Hurlbut*, 24 Mich. 44, 9 Am. Rep. 103: "There is no doubt of the right of the state to do any of these things; not by virtue of any general authority to take to itself the management of the local concerns, but because the inauguration and modification of local government can only be provided for without confusion and injustice by the aid of the guiding and assisting hand of the authority that creates and modifies. The right in the state is a right, not to run and operate the machinery of local government, but to provide for and put it in motion." This seems to be the very principle recognized by the framers of the constitution and carried into effect by the aforesaid amend-

ment to that instrument. And it may well be said that while general legislation as to municipal affairs is there prohibited, yet at the same time the very same section of the constitution reserves to the state, not the right "to run and operate the machinery of local government," but the right to provide for and put that machinery into motion. In *People v. Oakland,* 123 Cal. 604, it is held that a general law providing for the manner of annexing adjacent territory to a municipality did not deal with "municipal affairs," and was, therefore, without constitutional objection. It would seem that the adding of adjacent territory to a municipality and bringing the inhabitants of that territory within the government of the municipality was a matter of great moment and interest to the municipality. Yet it was held not to be such a municipal affair as contemplated by the constitution. This court there said: "As the legislature alone has the power to authorize such annexation, it must have the power to prescribe the terms, conditions, and mode of annexation." This language applies with full force to the question under discussion in the case at bar.

The charter act of 1897 is neither special legislation, nor does it lack uniformity of operation. The title of the act itself stamps the law as general legislation. The title purports upon its face to deal with a class of municipalities created by section 8 of article XI of the constitution. Legislation bearing upon a constitutional class of municipalities is not special legislation. The authorities in this state without exception so declare the law. Again, the act applies to all municipalities that are authorized to adopt freeholder charters. Such municipalities intrinsically constitute a class in themselves, and probably even in the absence of constitutional classification could be dealt with by general laws, but, in view of the constitutional classification, it cannot be denied for a moment but that legislation relating to such a class is both general and uniform. (*Mintzer v. Schilling,* 117 Cal. 361.)

It is not a light thing to set aside an act of the legislature, and the rule is elementary that unless it is perfectly plain that such act is violative of constitutional provisions a court will uphold it. With the policy of the legislation found in the act the court has nothing to do. This legislation may be wise or un-

wise. That is a matter with which the court has no concern. It is for the court alone to declare the law void or valid, and that declaration must rest upon the test, namely, Is this act clearly violative of some constitutional provision? In other words, the real question here is, Does it plainly and clearly appear that these two elections constituted "municipal affairs," within the meaning of those words as used in the constitution? In view of what has been said, we are not prepared to make that declaration.

The judgment and order are affirmed.

Van Dyke, J., and McFarland, J., concurred.

HARRISON, J.—The board of election commissioners of San Francisco directed that an election for freeholders to frame a charter for that city and county be held December 27, 1897, and a board of fifteen freeholders having been chosen upon that day, a charter framed by them was submitted to the voters of the city and county at an election held therefor under the direction and control of the board of election commissioners on the twenty-sixth day of May, 1898, and, having received a majority of the votes cast at that election, was approved by the legislature on the twenty-sixth day of January, A. D. 1899. Under a provision therefor in the charter this board of election commissioners has directed that an election be held on the seventh day of November, 1899, to fill certain offices named in the charter. The plaintiff herein, a taxpayer of the city and county, brought the present action to enjoin certain of its officers from incurring any expense in holding said election, and from paying out or disbursing any of the public moneys for any expense that may be incurred in holding the election, upon the ground that the elections at which the freeholders were chosen and upon the adoption of the charter framed by them were illegally held, and for that reason the charter, never having been legally adopted, was invalid.

After the board of election commissioners had directed the election for the freeholders, it caused the city and county to be redistricted into special election precincts for the purpose of said election, and consolidated the three hundred and thirteen general election precincts into which the city had been divided for the last preceding election into ninety-four special elec-

tion precincts, and designated one polling-place within each of
said special election precincts, and held this election and also the
one upon the adoption of the charter in the same precincts.
Prior to the holding of each of said elections the board of elec-
tion commissioners provided for supplemental registration at
the office of the registrar at the City Hall, but made no provi-
sion for precinct registration. Before the consolidation of the
precincts as aforesaid the board passed a resolution that the
special election for freeholders should be conducted in accord-
ance with the act relating to the election of freeholders and char-
ters, approved March 31, 1897 (Stats. 1897, p. 288), and that the
number of votes for each special election precinct be estimated
at seven hundred and fifty, or as near thereto as possible.

The superior court rendered judgment in favor of the defend-
ants, and from this judgment and an order denying a new trial
the plaintiff has appealed.

The grounds urged in support of the appeal herein are that
the act of 1897 is unconstitutional, and that inasmuch as the
elections for freeholders and upon the adoption of the charter
were held in conformity with the provisions of this act instead of
under the provisions of the act entitled, "An act to regulate the
registration of voters and to secure the purity of elections in the
city and county of San Francisco," passed March 18, 1878, they
were invalid, and that the charter adopted thereat was invalid
and confers no authority to hold an election for the offices
therein named. The particulars in which the invalidity of the
elections is urged are that the board of election commissioners
had no authority to consolidate the election precincts or to omit
precinct registration, and that they did not appoint proper elec-
tion boards for the precincts in which the elections were held.

The act of 1878 was a special act relating to San Francisco
alone, and at the adoption of the constitution of 1879 formed a
part of the charter of that city and county. By its provisions
the conduct, management, and control of elections and mat-
ters pertaining to elections was taken from the board of supervis-
ors, which, under the Political Code, then exercised this power
throughout the state, and was conferred upon the board of elec-
tion commissioners therein created. Section 6 of article XI
of the constitution of 1879, as originally adopted, after directing

the legislature to provide, by general laws, for the organization
of cities and towns, declared that "cities or towns heretofore or
hereafter organized, and all charters thereof framed or adopted
by authority of this constitution, shall be subject to and con-
trolled by general laws." In *Staude v. Election Commrs.,* 61
Cal. 321, it was said that the effect of this section was that San
Francisco "shall be subject to and controlled by such general
laws as the legislature shall enact, other than those for the in-
corporation, organization, and classification in proportion to
population of cities and towns." The Political Code is a gen-
eral law whose force extends throughout the state, and, in the
absence of any qualifying words, the legislature must be deemed
to intend that its provisions shall have uniform operation in all
parts of the state, and it was held in the case just cited that an
amendment to section 4109 of the Political Code, by which the
time for the election of all city and county officers was made uni-
form throughout the state, superseded a provision in the charter
of San Francisco providing a different time for the election of
those officers within that city and county. In 1889, the legis-
lature amended several sections of this code relating to elections
by extending their provisions to each of the counties and cities
and counties of the state, and by placing every board having
charge and control of elections in the same category with the
board of supervisors in each of the counties of the state, and
making the same provisions for cities and counties as for coun-
ties. By so doing it is manifest that it was the intention of the
legislature that its provisions should be operative in San Fran-
cisco. The city and county of San Francisco was the only polit-
ical subdivision of the state in which any board other than the
board of supervisors had the control and management of elec-
tions, and, as was said in Staude's case, we know judicially that
it was the only city and county in the state. To the extent,
therefore, that these amendments are inconsistent with or variant
from the provisions of the act of March 18, 1878, the latter is
superseded, and the city and county is subject to and controlled
by the provisions of the Political Code.

By the act of 1878 the board of election commissioners was
required to divide the city and county into election precincts
"as soon after each general election as convenient, not to exceed

ninety days." By the amendment to section 1127 of the Political Code the board is required to divide the city and county into election precincts "as soon *before* a general election as is convenient." Section 1129 of the code as originally enacted gave to the board of supervisors in each county authority "from time to time to change the boundaries of, create new, or consolidate established precincts," but there was no provision in the act of 1878 for changing the boundaries of the election precincts, when once made, until after another general election. Section 1129 was, however, amended in 1889 to read as follows: "The board of supervisors or other board having charge and control of elections in each of the counties and cities and counties of the state may, from time to time, change the boundaries of, create new or consolidate established precincts; provided, that there shall always be as many precincts as shall be sufficient to make the number of votes polled at any one precinct to be not more than two hundred as nearly as can be ascertained."

Under this section, as thus amended, the authority of the board of election commissioners of San Francisco prior to the adoption to the amendment to section 6 of article II of the constitution, in 1896, to consolidate established precincts is without question, and, unless that amendment has taken from them this authority, they must be held to have been authorized to consolidate the precincts for the purposes of the elections herein considered.

In 1896 the above clause in section 6 of article XI was amended to read as follows: "Cities or towns heretofore or hereafter organized, and all charters thereof framed or adopted by authority of the constitution, except in municipal affairs, shall be subject to and controlled by general laws." It is contended by the appellants that the elections for freeholders, and upon the adoption of the charter, proposed by them, were "municipal affairs," and were therefore not subject to or controlled by general laws.

The construction of the section as thus amended involves a determination of the meaning to be given to the term "municipal affairs," as used therein. The term "affair" is a word of wide import, and has been held to be more comprehensive than the word "business." (See *Morrison v. Bachert*, 112 Pa. St. 322.)

Although it may be difficult to give a definition of the term "municipal affairs," as used in this section, which will be exhaustive or precise, it cannot be held that the effect of the amendment is to preclude the legislature from enacting laws relating to matters which might be made the subject of municipal control, or that all municipalities are exempt from all general laws which the legislature may enact. It has been decided so frequently, that it may be said to have become a maxim in jurisprudence, that a municipal corporation has only such powers as are given to it by its charter, and that it must find authority in its charter or under some general law for every municipal act which it may perform. The municipal affairs of any individual municipal corporation are, therefore, such affairs only as that municipality has the power to engage in or perform, and the municipal affairs of one city may vary greatly from those of any other city—and this, too, whether the charter of the city has been conferred upon it by the legislature or has been framed by a board of freeholders of its own choice, and afterward adopted by its citizens and approved by the legislature. In either case, the municipality can exercise only the powers found in its charter. If, however, the charter of a city, whether given to it by the legislature prior to the constitution of 1879, or framed by a board of freeholders, contains no provision in reference to subjects which might have been included therein, that city or its inhabitants is not thereby freed from legislative control. The legislature is vested with the law-making power of the state, and the general laws passed by it have force in all parts of the state, unless, by virtue of some provision in the constitution, such effect is limited, or the law-making power has been lodged elsewhere. A city cannot claim to be exempt from general laws relating to municipal affairs if there is no provision relating to such affairs in the charter under which it is acting, whether such charter is one framed by itself or was given to it by the legislature. If, in framing its charter, its board of freeholders should make no provision for a public library, or for the improvement of its streets, the general laws upon those subjects would be operative within that city. It is not within the constitutional power of the legislature, by approving a freeholders' charter which fails to make provision upon subjects pertaining to municipal affairs, to exempt that city from

being subject to legislative control in reference to those subjects, nor can the city secure exemption from such control by omitting to make such provision in its charter. If, by adopting a charter which failed to give to it power to act upon affairs which are properly municipal, a city could be freed from any legislative control in reference to those affairs, either by itself or by the legislature, that city would become a veritable Alsatia.

Under these considerations it must be held that the exception in the above clause in section 6 of article XI, placed there by the amendment of 1896, applies only to such municipal affairs as are within the power of the particular municipality to perform, and that every city in the state is subject to and controlled by general laws relating to municipal affairs, unless, by virtue of some provision of the charter under which it exists and is acting, such municipal affairs may be engaged in and performed by it. The clause is to receive a distributive construction, and is to be read as if its language were: "Any city or town heretofore or hereafter organized, and every charter thereof framed or adopted by authority of this constitution, except in its municipal affairs, shall be subject to and controlled by general laws."

We have seen that the provisions of the act of March 18, 1878, relating to the division of San Francisco into election precincts, were superseded by the amendments to the Political Code in 1889, and that from that date these provisions of the Political Code constituted the only law upon that subject which was applicable to San Francisco. It may be conceded that each of the elections herein considered, as well as the creation or consolidation of the precincts at which the elections were held, is a "municipal affair," but, as since the amendment to the Political Code in 1889 there has been no provision in the charter of San Francisco relating to the creation or consolidation of election precincts, the city was subject to and controlled by the general laws existing in reference thereto. Section 1129 of the Political Code was in force within the city and county of San Francisco at the dates of these elections, and under this section the consolidation of the election precincts for the purpose of these elections was within the power conferred upon the board of election commissioners.

Inasmuch as the board had the power to consolidate the precincts "from time to time," as might seem to it desirable or proper, this power was not diminished or its exercise impaired by the fact that the board purported to exercise it under the act of 1897. If it had authority to consolidate the election precincts irrespective of this statute, it had the right to adopt its provisions in this respect as the basis of its consolidation, even though the legislature had no authority to enact the statute. It is unnecessary, therefore, to determine whether this statute is obnoxious to the charge of being special legislation, or whether it was within the power of the legislature to enact.

The provision in section 1129, that the precinct shall be sufficient "to make the number of votes polled at any one precinct to be not more than two hundred, as nearly as can be ascertained," is not to be regarded as jurisdictional, but is merely directory. The concluding clause, "as nearly as can be ascertained," shows that much is left to the discretion of the board, and, in the absence of any showing that by reason of a failure to observe this direction the fairness of the election or the completeness of the vote was affected, the act of the board in making the consolidation must be upheld. The finding of the court that at least one week before either election was held a written notification was mailed to each and every elector in the city and county whose name appeared upon the register informing him specifically of the exact location of the polling-place in his special precinct, and inclosing therewith a sample of the ballot to be used at said election, takes away all claim of any want of notice to voters. It is not claimed that the board acted in bad faith, or that any citizen was deprived of his vote, the only claim being that by reason of the registered vote within each of said precincts being much greater than two hundred, the board must be presumed to have abused its discretion in consolidating the precincts in the manner it did.

We need not determine whether this provision in section 1129 is to be construed as requiring the registered vote to be the criterion for fixing the extent of the precincts, or whether the board had the right to fix their extent upon its estimate of the number of registered votes which would be polled at the election. The wording of the section is such that the board might

act in good faith in making the number of precincts such as in their opinion would make the number of votes which would be polled at each precinct not more than two hundred. It was competent for any citizen, if he deemed the boundaries of the precincts to be in violation of this clause in the section, to seek their correction prior to the election. He ought not after the election has taken place to be allowed to impeach it upon this ground alone, unless he can show that by reason thereof a fair election was prevented.

There is no express provision in the act of 1878 directing precinct registration to be had for special elections, and a consideration of the entire act leads to the conclusion that such registration is not authorized. Section 20 of the act requires the boards of precinct registration to meet in their respective precincts, "commencing five days before the day fixed by this act for the cessation of registration of electors in said city and county, and to sit in open session from 9 o'clock A. M. until 10 o'clock P. M. of each day until the day of such cessation"; and by section 22 they are required to continue registration of voters within their respective precincts "until the time provided by law for registration to cease"; and by section 24 to deliver the precinct registers to the registrar "not later than three full days after the cessation of registration, as provided by law." Section 28 declares: "Fifteen days before a general election all registration or enrollment of voters shall cease, and the precinct registers as they stand shall be the precinct registers for said ensuing election and until the next general election," subject only to changes in certain cases; and at the close of this section it is provided that changes and additions to said precinct registers for use at other than general elections may be made after the general election and prior to any special election, "under the regulations fixed by the board of election commissioners." Under a proper construction of these provisions, registration for a special election is to be made under regulations fixed by the board of election commissioners, and need not be made in the several precincts. The provision in section 31 that the additional names shall be "noted upon the register for each special election thereafter or added in supplements thereto, and conformatory so far as the same is applicable to the provisions

of the law governing the making of the general election regis-
ter," has reference to the manner of preparing the precinct
registers for use at the special elections and not to the mode
or time of registration. The provision in this section that af-
ter the voter has been legally registered in the precinct register,
he may vote in such precinct at any election taking place before
the next general election was for the purpose of giving him the
right to vote at such election without renewing his registration,
and not for the purpose of defining the place at which he should
vote. His right to vote in the same precinct is subordinate to
the right of the board of election commissioners to change that
precinct or consolidate it with others, and is not impaired by
such enlargement of its boundaries and fixing a different poll-
ing place within the boundaries thus extended.

A consideration of the spirit and object of the act of 1878
leads also to the same conclusion. The main purpose of the
act, as shown by its provisions, was to secure a full registration of
the voters of the city, with as little inconvenience to them as
was practicable. For this purpose the act provides an extended
period for registration at the office of the registrar, within which
voters may be enrolled, and that at the close of this period those
who have been unable to avail themselves of this opportunity
may resort to some designated place within their respective pre-
cincts and there be registered. To still further accommodate
the voters, they are not required to present themselves for pre-
cinct registration within the usual hours for public offices, but
the act provides that the boards of precinct registration shall
sit in open session each day of their session until 10 o'clock P. M.
It must be assumed that in this mode the registration for a gen-
eral election will contain the names of all who are qualified to
vote, and as the registers thus prepared for use at the general
election are to be used at all special elections that may be held
before another general election, with such additions as may be
made thereto, there is no manifest reason for requiring precinct
registration in connection with any special election, and, in the
absence of direct provision therefor, it should be held that it is
not required. The few changes or additions that may be de-
sired are readily to be made at the office of the registrar under
the regulations of the board of election commissioners.

The omission of the board of election commissioners to appoint for each precinct as many officers of election as it was authorized to appoint (a proposition upon which we pass no opinion), does not authorize the election to be set aside. Such omission was but an irregularity, and it is not shown that it had any effect upon the election, either in the number of votes that were cast, or in the correctness of their canvass and return.

The judgment and order are affirmed.

Beatty, C. J., and Henshaw, J., concurred in the opinion of Harrison, J.

TEMPLE, J.—I concur in the judgment. But I am of the opinion that the "framing of a charter" by a city "for its own government" under the authority given by section 8, article XI, is a municipal affair, and I also think there was in the charter of the city and county of San Francisco a provision under which the elections here questioned might have been held. I am, therefore, unable to concur in either of the opinions already prepared.

It is unfortunate that when section 6, article XI, was amended its meaning should be left in doubt. Before amendment it had been the subject of much contention, and we were entitled to expect that when amended there would be no ambiguity left. The clause amended had been construed and its meaning determined by numerous decisions of this court in which there was no conflict. It was contended on one side that the general laws, which the constitution provided should control cities and towns and the charters thereof, were those general laws which operated upon all persons throughout the state, such as the Criminal Code, the Code of Civil Procedure, the statute of frauds, et cetera. But the court steadily ruled against this contention and held that the restriction did not "at all affect the power to control or regulate the charters of all municipal corporations by laws general in their character. This power is expressly recognized by the last clause of section 6, above cited, where it is declared that 'cities and towns heretofore or hereafter organized, and all charters thereof framed and adopted by authority of this constitution, shall be subject to and controlled by general laws.'" (*Thomason v. Ashworth*, 73

Cal. 73.) Many attempts were made to overthrow this conclusion, and in various cases earnest dissenting opinions were filed insisting upon a contrary view. But, notwithstanding many changes in the personnel of the court, that ruling was never reversed or modified. It was argued by those who favored the view adopted by the court that the last clause of section 6 was put in for the express purpose of showing that, although a novel municipal organization was authorized which secured some degree of home rule, and which had been made "immune" from attacks by special laws, they were nevertheless subject to general laws which would control and might alter their charters. It was certainly an assurance of legislative power and authority over such charters for some purposes. General laws like the statute of frauds or the Code of Civil Procedure do not and could not control cities and towns as such, and certainly not their charters. And, even if there were any way in which they could indirectly do so, it is impossible to imagine that the members of the constitutional convention apprehended any danger that it could be held that such laws did not prevail in cities and towns. But, if the contrary view was intended, there was reason to fear that the construction would be contended for which actually was asserted notwithstanding the precaution, that such charters could not be controlled by general laws. At all events, this rule was persistently maintained by this court, and in the face of and because of it the clause was amended.

That the form of the amendment is unfortunate is, in my opinion, demonstrated by the two opinions filed in this case. They differ widely as to what are municipal affairs within the meaning of the amendment. The language is in itself quite unambiguous, but the difficulty arises solely from the fact that the exception, construed in the light of the meaning uniformly given to the unamended clause by this court, and also giving the language its obvious import, plainly includes the entire proposition excepted to. I think we must suppose that the author of the amendment had in mind the contention of the justices who dissented from the established doctrine, and that it means that the legislature cannot by any general law add to, modify, or control the charter of any municipality. This is also the natural force and effect of the unambiguous language

used. And if it be admitted that all the power in terms granted is expressly denied by the exception, still it must stand as an inhibition upon any legislation which would directly affect cities and towns as municipal corporations. Indeed, the first few clauses in section 6 in substance declare that any purpose for which cities and towns are organized are municipal affairs. The word "affairs" would include all possible laws. Municipal means simply pertaining to a municipality. It is not permitted to construe unambiguous language used in statutes.

If the legislature may still control such charters by general laws in regard to matters not expressly provided for, a wide margin of uncertainty is still left and a charter by such laws may yet be made. "Quite another [municipal] affair." Presumptively that which was omitted was not desired.

The other definition, as I understand it, confines the immunity to municipal business. The phrase conveys no definite meaning to my mind. Does it include such police regulations as might prohibit opium joints, or fast driving in the streets, and a thousand and one other matters which make up the city government?

I submit that there is no warrant in any language found in the constitution for either construction. To hold, notwithstanding the plain language of the constitution, that these charters are to be practically amended in some respects, or by some general laws, in regard to municipal affairs, is to disregard the words of the amendment and not to construe it. It may be found that the municipal offspring was badly crippled in the accouchement.

My views do not require me to discuss at length many matters found important in the other opinions. I think, however, the constitution authorizes the city to frame a charter for its own government by causing fifteen freeholders to be elected who *pro hac vice* represent the city. It is none the less the act of the city, as such, because a referendum is provided to its constituent members, who, collectively incorporated, are the municipality. I think there was a provision in its charter under which the elections called in question could and should have been held, and that the election was not held as this charter provision required. I refer, of course, to the act of 1878.

But I think we are neither authorized nor required to determine whether the municipal elections were duly and regularly conducted. That was settled by the legislature when it enacted the charter into a law. This position is admitted in *People v. Gunn,* 85 Cal. 238, if the legislature, as to the charter, is the law-making power. It is there said, however, that as to the charter the legislature is not the law-making power. This question was again reviewed in *Ex parte Sparks,* 120 Cal. 395; some of the justices, though not constituting a majority of the court, held that since an amendment was made to the constitution, providing that the charter may be approved by joint resolution, such charter becomes the law of the state through the action of the legislature. It was said: "It prevails and has force as a law of this state, and is not made a law by the people of the municipality or by virtue of authority delegated to them. It is proposed by the municipality, and accepted and passed into law by the legislature, or rejected as it shall see fit." Many reason's additional to these stated in *Ex parte Sparks, supra,* might be given, but it is unnecessary, for all the attorneys in this case admit that such is the law—that the doctrine laid down in *Ex parte Sparks, supra,* is the true doctrine.

It was necessary for the legislature to determine that the charter had been framed by the city for its own government before it proceeded to enact it into a law. No record was required to be kept which should furnish conclusive evidence as to what was actually done in holding these elections. No private rights were involved. No one had a peculiar interest in the question. The whole proceeding was governmental and political. And the fact that the legislature enacted the charter into a law is conclusive evidence that it made the proper investigation and found the requisite facts which would warrant its action. Many cases upon this subject are cited in *Stevenson v. Colgan,* 91 Cal. 649, 25 Am. St. Rep. 230, where the principle is fully discussed. .

But I contend that even if it were admitted that the function of the legislature is correctly stated in *People v. Gunn, supra,* still, on principle, the action of the legislature is conclusive. If the action is legislative in its character—that is, something that is within the domain of the legislature as a co-

404 MARTIN v. ELECTION COMMISSIONERS. [126 Cal.

ordinate department of the government—its action is conclusive upon the other departments. This rule applies to each department—to the executive as well as to any other. In the performance of a purely executive act the governor cannot be controlled, and all his determinations of facts which induced his action are conclusive. This is illustrated in the power of the executive to declare martial law, or to suspend the right to issue certain writs in case of insurrection or rebellion. Possibly, in regard to matters where the law requires records to be kept and makes them conclusive on all departments, this may not be so. We may look to see if the governor or the legislature has acted in the mode required by the constitution. That is not the question here. Admittedly, the legislature pursued the method required by the constitution, and the question is as to the effect of legislative action which is regular and valid. There is nothing giving peculiar force to the action of the legislature in enacting a statute rather than any other action which is made a function of that department of the government by the constitution. To approve or disapprove a freeholders' charter is especially committed to the legislature by the constitution. Whether it performs this duty by resolution or by bill, it is equally a legislative act which concludes the other two departments. If the legislature were to refuse to act at all upon a proposed charter no power could compel it to do so, simply because it is a peculiar function of the legislature. It approves or disapproves as a legislature, a co-ordinate department of the state government.