**MASONIC CEMETERY ASS'N et al. v. GAMAGE et al.***

No. 5851.

Circuit Court of Appeals, Ninth Circuit.
March 10, 1930.

*Rehearing denied May 12, 1930.

DIETRICH, Circuit Judge, dissenting.

Sullivan & Barry and Theo. J. Roche, of San Francisco, Cal., for appellants.

Aaron M. Sargent, of San Francisco, Cal. (Geo. Clark Sargent and Peter tum Suden, both of San Francisco, Cal., of counsel), for appellees.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

WILBUR, Circuit Judge.

This is an appeal from an interlocutory injunction by the District Court, at the instance of the appellees, sixteen lot holders within said cemetery, to prevent the appellants from complying with a municipal ordinance of the city and county of San Francisco declaring the Masonic Cemetery, within the limits thereof, a nuisance and directing the removal therefrom of all the bodies buried therein by the appellant corporation, or by the individual lot owners. The appellant association was organized in 1864 under the act authorizing the establishment and maintenance of rural cemeteries enacted in 1859 by the Legislature of the state of California (Stat. 1859, p. 234), and which association established and has maintained the Masonic Cemetery since its organization. The other appellants are the directors of the association.

This action was brought in the District Court on the ground that the constitutional rights of the appellees were invaded or threatened by the contemplated action of the appellants. The appellees seek, not merely an order preventing interference with their own particular lots, but all others, and, in effect, seek by injunction to require the maintenance of the cemetery as such, notwithstanding the fact that the state has declared the continuance thereof a nuisance and in spite of the fact that a majority of the lot owners, at a properly called meeting, have expressed a desire to abandon the cemetery and remove the bodies therefrom. The most that the appellees concede is the right of individual lot owners, or the relatives of deceased persons whose bodies are interred therein, to remove the bodies or consent thereto, and the interlocutory decree so provides. That is to say, the appellants are prevented from removing over 5,000 bodies at the instance of the small number of lot holders who join herein as plaintiffs.

Before discussing the legal problems involved, a brief statement of the situation will be made.

In 1900 the city and county of San Francisco, by its legislative body, the board of supervisors, enacted legislation prohibiting further burials in any cemetery within the city and county of San Francisco. This ordinance was held to be a constitutional exercise of authority by the Supreme Court of the state of California. Odd Fellows' Cemetery Ass'n v. City & County of San Francisco, 140 Cal. 226, 73 P. 987; Laurel Hill Cemetery v. City & County of San Francisco, 152 Cal. 464, 93 P. 70, 27 L. R. A. (N. S.) 260, 14 Ann. Cas. 1080.

The latter decision was affirmed by the Supreme Court of the United States, 216 U. S. 358, 30 S. Ct. 301, 54 L. Ed. 515. The power of the state to prohibit further burials within these cemeteries and within the limits of the city and county was thus established. Later in 1921 (Stats. 1921, p. 199) the Legislature of California enacted a law permitting, but not requiring, the appellant and other cemetery associations to remove from the cemetery the bodies then interred therein. Acting upon the authority thus granted the appellant proceeded to act thereon, but were prevented by some of the lot owners, on the ground that their rights were being infringed. The Supreme Court of California held that, as the act was merely permissive, it was therefore not an exercise of the police power of the state. Hornblower v. Masonic Cemetery Ass'n, 191 Cal. 83, 214 P. 978, 981. In its opinion therein the court defined the rights of the lot holders, so far as was necessary to the decision, and indicated that, if the action of the Legislature had been a direct exercise of its police power requiring

952

the removal of the bodies, the action would have been constitutional. In that regard the court made the following statement:

"Undoubtedly the Legislature had the power to terminate this right of appellant's by the enactment of a statute in the proper exercise of its police power. If the Legislature should find and determine that the continued maintenance of cemeteries in cities of the class described in the Morris Act will be dangerous or detrimental to the health of the citizens, it could compel the removal of the bodies and the abandonment of the cemeteries, and thus terminate the right of the lot owners to their continued maintenance."

The state Legislature thereafter in 1923 enacted a law (Stats. 1923, p. 646) delegating to the legislative bodies of municipalities of over 100,000 inhabitants to require the removal of bodies from cemeteries therein where interments therein had been prohibited by law for fifteen years or more, whenever the local legislative body declares further maintenance of the cemetery endangers the health, safety, comfort, or welfare of the public. Acting in pursuance of this authority and in accordance with its terms, the board of supervisors of the city and county of San Francisco, on July 9, 1928, passed an ordinance requiring the removal of all human bodies interred in the cemetery maintained by the appellants, and on the same day enacted a similar ordinance applicable to the Odd Fellows Cemetery, but did not then and has not yet so acted with reference to the Calvary and the Laurel Hill Cemeteries closely adjoining the cemetery maintained by appellants.

■ It is contended by the appellee that the attempted delegation of legislative authority by the state Legislature, and the exercise thereof by the board of supervisors, were both unavailing because of the fact that the powers of the board of supervisors are defunct by the charter of the city and county of San Francisco, and that the legislative powers of that body as therein defined can only be altered by an amendment to the charter which requires a vote of the people of the city and county as a necessary preliminary step to the adoption of amendments thereto. This point is not well taken. The Constitution of California, article 11, § 11, vests in the legislative body of a municipality or county the power to enact local public and sanitary legislation not inconsistent with general laws. This is a part of the police power of the state directly granted by the people of the state to the municipal legislature. With reference to this subject the Supreme Court of California, speaking through Justice Shaw, in Odd Fellows' Cem. Ass'n v. City & County of San Francisco, 140 Cal. 226, 230, 73 P. 987, 988, said: "By virtue of this clause, the constitutional grant of the police powers of the state to the city goes directly to and vests in the board, which thereby becomes possessed of the right, within the city limits, to exercise the entire police power of the state, subject only to the control of general laws."

■ In that case it was held that this general grant of legislative power in the Constitution of California authorized the board of supervisors to prohibt future burials in cemeteries within the city and county, subject only to the general laws of the state. Where the state Legislature has expressly authorized the legislative body of the city to exercise certain police powers with reference to cemeteries as it has done here, it is difficult to see how there can be a conflict between the state law and the enactment which is fully authorized by the state Constitution where it does not conflict with a general law. It was not necessary for the state Legislature to grant police power to the city within its boundaries. It had only to definitely retire from that particular legislative field, and this it did by expressly authorizing the act in question and thus in effect repealing any general laws on the subject which otherwise might interfere with the free exercise of the police power of the city and county. It is suggested by appellees, rather than argued, that the matter involved is a municipal affair and therefore regulated by the freeholders' charter adopted in pursuance of the Constitution of California, art. 11, § 6. Without elaborate discussion we think it may be said that without doubt the burial of the dead and the maintenance of cemeteries is not a municipal affair. See Ex parte Daniels, 183 Cal. 636, 641, 192 P. 442, 21 A. L. R. 1172, with relation to traffic regulation, and see cases cited in Odd Fellows' Cemetery Ass'n v. City & County of San Francisco, supra, page 231 of 140 Cal., 73 P. 987; see discussion in Fragley v. Phelan, 126 Cal. 383, 58 P. 923.

In view of the action of both the state and of the municipal legislature, and in view of the presumption of the due exercise of constitutional authority, in the absence of a fuller discussion of the subject in the briefs and in the absence of any clear decision by the Supreme Court of California against the authority of such legislative bodies, and in view of the fact that on the contrary the deci-

sions of that court apparently fully support that power, we feel justified in assuming without further discussion that the authorities of the state have herein exercised to the full their police power, and that the question for our consideration is whether in so doing they have authorized a violation of private rights guaranteed to appellees by the Constitution of the United States. These rights are defined in the act authorizing the creation of the association. Stat. 1859, p. 281. The lots are sold by the association to the individual lot owners and all the proceeds thereof devoted to the payment of bonds issued the vendor of the cemetery to the association and in "the improvement, embellishment and preservation of such cemetery, and for incidental expenses, and to no other purpose or object." The cemetery and the lots are exempt from public taxes, rates, and assessments, and shall not be sold on execution or be applied in payment of debts due from any individual proprietors "so long as they remain dedicated to the purpose of a cemetery." No streets can be laid through the cemetery, although this section was amended in 1911 to permit streets to be so opened. Stat. 1911, p. 1100, c. 578. Section 11 deals more directly with the rights of the individual appellees and will therefore be quoted in full:

"Sec. 11. Whenever the said lands shall be laid off into lots, or plats, and such lots, or plats, or any of them, shall be transferred to individual holders, and after there shall have been an interment in a lot, or plat, so transferred, such lot, or plat, from the time of such interment, shall be forever thereafter inalienable, and shall, upon the death of the holder or proprietor thereof, descend to the heirs-at-law of such holder or proprietor, and to their heirs-at-law forever; provided, nevertheless, that any one or more of such heirs-at-law may release, to any other of the said heirs-at-law, his, her, or their, interest in the same, on such conditions as shall be agreed on and specified in such release, which release shall be recorded with the county recorder of the county within which the said cemetery shall be situated; and provided, further, that the body of any deceased person shall not be interred in such lot, or plat, unless it be the body of a person having, at the time of such decease, an interest in such lot, or plat, or the relative of some person having such interest, or the wife of such person, or her relative, except by the consent of all persons having an interest in such lot, or plat."

The habendum clause of the deeds under which appellees claim contains the following reference to the foregoing section: "Subject to the provision of section 11 of an act of the legislature of the State of California entitled 'An Act to authorize the incorporation of Rural Cemetery Associations' approved April 18, 1859."

■ The appellees seem to assert that under their deeds or the deeds to their ancestors, as the case may be, that they have a fee simple absolute in the lots purchased from the cemetery association, or if less, but slightly less, but this is clearly not true. They say that the exact nature of their property rights in these cemetery lots is not involved and ought not to be determined in this action without "their day in court." If that question is not involved, nothing is involved, for the jurisdiction of the federal court has been invoked to protect property rights from an unconstitutional invasion thereof. It is urged that the deeds to them purport to convey a fee simple in the property, and that these deeds should be before the court for interpretation before their rights are adjudicated. The statute under which the deeds are executed became a part of the deeds both by implication and by reference, and no greater or different rights can be conferred by the cemetery association than they are authorized to do by the act. The wording of the deeds is entirely insignificant for this reason, that the lot owners secure a valuable property right enforceable in equity has been determined. Hornblower v. Masonic Cem. Ass'n, 191 Cal. 83, 214 P. 978, supra. The question here is to what extent that right is subject to the police power of the state. The above-quoted section 11 implies a right of any heir, or heir of an heir, forever thereafter to be buried in a lot purchased by an ancestor. This right has been already terminated and destroyed under the police power of the state by the forbidding of all future burials. See cases supra, and Laurel Hill Cem. Ass'n v. City & County of San Francisco, supra. What right remains in the purchaser or his heirs? The right asserted here is that of keeping interred therein forever the body of the deceased ancestor and others buried therein, and to compel the use of all other portions of the cemetery for a similar purpose, or not at all. If sixteen lot owners can do it, one alone can, and although the 13,932 bodies therein may be properly removed, that one will not only remain interred therein, but the whole cemetery must remain intact because of the right

of the lot holder in the cemetery as a whole. The claims advanced here are entirely inconsistent with the idea that the title to the land of a cemetery is divided up into lots separately and severally owned in fee simple. We refer to the statement of the Supreme Court of California in the opinion in Hornblower v. Masonic Cemetery Ass'n of City and County of San Francisco, supra:

"Counsel for respondent define the rights of a purchaser of a cemetery lot as follows: 'He becomes a member of the corporation; he gains the right to bury in the lot so long as burials are not prohibited by competent authority; and he. also gains the right to maintain the bodies buried in the lot so long as no lawful authority enforces the removal of them.' This definition seems to accord, both with reason and with the preponderant authority, and for the purposes of this decision we shall accept it as correct."

The question was involved under an almost identical statute of New York (statute of 1847 [Laws 1847, c. 133]) where the exact nature of the individual lot owners title was more directly involved because it was claimed that an assessment for street improvements on a street abutting on the cemetery should be assessed only upon the cemetery lots abutting on the street and not upon the whole cemetery. The Court of Appeals of New York, Buffalo City Cemetery v. City of Buffalo, 46 N. Y. 503, in passing upon that subject, defined the effect of the conveyance to the lot holder as follows:

"The effect of such conveyance, under the statute from which the plaintiff derives its powers, is we suppose (for no copy of any conveyance is laid before us), no more than to confer upon the holder of a lot a right to use for the purpose of interments. No such estate is granted as makes him an owner in such sense as to exclude the general proprietorship of the association. The association remains the owner in general, and holds that relation to the public and to the government, while subject to this, the individual has a right exclusive of any other person to bury upon the subdivided plat assigned to him. He holds a position analogous to that of a new holder in a house for public worship. It is a right exclusive of any other of the congregation, but subject to the right of the religious corporation, which represents the ownership of the property to the public, and is the legal owner of the fee of the property. This being so, we see no error made by the respondent in assessing the expense of the sidewalk to the whole property, and to the appellant as owner," etc.

Later the question was again presented to the New York Court of Appeals (Went v. Methodist Protestant Church, 150 N. Y. 577, 44 N. E. 1129) wherein that court adopted the opinion of the Supreme Court of New York in Went v. Methodist Protestant Church, 80 Hun, 266, 30 N. Y. S. 157, dealing with an act of the New York state Legislature similar to the action of the California authorities here involved. The court there sustained the right of sale of the cemetery association and the removal of the bodies interred therein and of the monuments and headstones therein to a new cemetery without compensation to the lotholders, as authorized by the state Legislature of New York. It was there decided that the state under its police power could require or permit the removal of bodies from a cemetery, and that the rights of lot owners were sufficiently safeguarded by the reinterment in a new cemetery. To the same effect is the decision by the Supreme Court of Pennsylvania in Kincaid's Appeal, 66 Pa. 41, 5 Am. Rep. 377. See, also, on the general subject, Sohier v. Trinity Church, 109 Mass. 1; Page v. Symonds, 63 N. H. 17, 56 Am. Rep. 481; Union Cemetery Co. v. Alexander, 14 Ala. App. 217, 69 So. 251; State v. Scoville, 78 Conn. 90, 61 A. 63; Nicolson v. Daffin, 142 Ga. 729, 83 S. E. 658, L. R. A. 1915E, 168; McWhirter v. Newell, 200 Ill. 583, 66 N. E. 345; Anderson v. Acheson, 132 Iowa, 744, 110 N. W. 335, 9 L. R. A. (N. S.) 217; Hertle v. Riddell, 127 Ky. 623, 106 S. W. 282, 15 L. R. A. (N. S.) 796, 128 Am. St. Rep. 364; Gowen v. Bessey, 94 Me. 114, 46 A. 792; Davis v. Coventry, 65 Kan. 557, 70 P. 583; Gardner v. Swan Point Cemetery, 20 R. I. 646, 40 A. 871, 78 Am. St. Rep. 897; Mansker v. Astoria, 100 Or. 435, 198 P. 199, 199 P. 381. It has been generally, if not universally, held that cemeteries are subject to the police power of the state, and no authorities have been cited by the appellees to the contrary.

The real complaint of the appellees is that the state authorities have exercised their conceded police power unreasonably and oppressively and unfairly. That is to say that the action of the Legislative authorities was not in good faith. Such a question is one upon which the courts have been most reluctant to act. Dobbins v. Los Angeles, 195 U. S. 223, 25 S. Ct. 18, 49 L. Ed. 169. For that reason it sustained the ordinance of San Francisco altogether prohibiting further burials within that city and county. Laurel Hill Cemetery Ass'n v. City & County of San Francisco, supra. It is claimed here that there was no basis for the legislative declara-

tion that the cemetery in question was a public nuisance, or that the health of the public was in any way involved. It appears, however, that other considerations relating to the appropriate exercise of the police power are involved in the legislation. Some of these considerations will be briefly stated. The cemetery in question has been virtually abandoned. Its graves and tombs are neglected. It has been overgrown with rank vegetation. No funds have been provided by the lot holders for its proper maintenance, and there is no likelihood that such funds will be provided. The total income from the lot owners has been stated to be about $12 per annum. The cemetery, originally on the outskirts of the city's population, is now surrounded by dwellings. The Richmond district of the city is bounded on the south by Golden Gate Park, a very long park with no cross streets directly through it, on the north by the presidio, a government military reservation, on the west by the Pacific Ocean and on the east by the four above-mentioned cemeteries, Laurel Hill, Calvary, Odd Fellows, and Masonic. These cemeteries do not completely block off the Richmond district from the balance of the city, but restrict the travel to five streets. Eight streets from the downtown districts of the city terminate at the cemeteries. These cemeteries contain a large area, the Masonic twenty-eight acres, Odd Fellows thirty, Calvary fifty, Laurel Hill fifty-seven, in all one hundred sixty-five acres, unlighted at night. The chief of the fire department declares under oath that the cemeteries menace the safety of life and property in the Richmond residential district where over a hundred thousand people live, mostly in wooden houses built very close together, because of the necessary delay in responding to a general alarm which will call in other apparatus to assist that situated in the district. There is no reason to doubt the truth of this statement, and the great fire of 1906 indicates the wisdom of careful attention to the fire hazard in such a community. If this is a true statement of the condition, the action of the board of supervisors was, not only fully justified, but urgently demanded. The condition of the cemetery is thus described by the secretary thereof who is also one of the directors:

"About fifteen years ago the directors of the defendant corporation, foreseeing the condition which would necessarily result from want of care of graves in the cemetery, made an appeal to the lot holders for an annual contribution for the maintenance of the cemetery, but the returns following such appeal were not sufficient to cover the cost of postage stamps on letters sent to the lot holders. The cemetery, by reason of its entire lack of revenue to keep it in good condition, has become a wilderness and a danger and menace to the community. Thousands of graves uncared for are covered with weeds and shrubs. Vandals have destroyed and continue to destroy the monuments, vaults and tombstones in said cemetery. Thieves have stolen and continue to steal movable things of value, particularly copper, bronze, brass, steel and iron. The cemetery is the habitat of vagrants, is frequented by persons of loose character, who frequently entice school girls into the grounds for immoral purposes."

We conclude that the situation disclosed by the record, if it does not amply justify the exercise of the police power of the state, at least does not present such an arbitrary or unreasonable exercise thereof as would justify the court in declaring the enactment void as violative of the constitutional rights of the appellees. This was also the view of the trial judge, but he held that the action of the supervisors was arbitrary and discriminatory, denying to the appellants the equal protection of the law, in that two cemeteries similarly situated, and both blocking the entrance to the Richmond district, were not declared to be nuisances and the associations or corporation sole in charge thereof were not required to remove therefrom the bodies interred therein. Gamage v. Masonic Cem. Ass'n (D. C.) 31 F.(2d) 308. It will be noted that no affirmative action was taken authorizing the continued maintenance of the other cemeteries. The board of supervisors simply neglected to act affirmatively in declaring such cemeteries to be a nuisance at the same time it declared the Masonic and Odd Fellows Cemeteries to be public nuisances. If this legislation is held to be void merely because discriminatory, if each lot holder in each cemetery has a constitutional right to require all these cemeteries to be abandoned at once, or none at all, we have a unique situation without parallel in the authorities. Considered solely from the question of fire hazard to the Richmond district, it is obvious that the removal of any one of these cemeteries would greatly relieve the situation. The problem of removal of bodies is itself a large one in which the entire community is interested, as well as the lot holders. About 14,000 bodies are buried in the Masonic cemetery and 30,000 in the Odd Fellows cemetery, while each of the others contain 50,000,

each more than both the others, wherein the bodies have been ordered removed. The problem presented by the claim of discrimination then involves the proposition that, in order to lawfully order the removal of 14,000 bodies the Legislature must order the disinterment of ten times that number, and multiply the damage, if there be a damage, by ten. If the board of supervisors had authorized the resumption of burials in one or more of these cemeteries and had at the same time prohibited such burials in the others, or had required the removal of the bodies already interred therein, there might be a just claim of discrimination upon which the power of the court might be invoked, but such is not the case here. If these cemeteries are in fact all public nuisances, there is nothing to prevent their abatement one at a time. If any authority is needed for so obvious a statement, it is, we think, supplied in Barbier v. Connolly, 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923; State of Ohio v. Dollison, 194 U. S. 445, 24 S. Ct. 703, 48 L. Ed. 1062; Ex parte Hadacheck, 165 Cal. 416, 132 P. 584, L. R. A. 1916B, 1248; Hadacheck v. Sebastian, 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927; Reinman v. Little Rock, 237 U. S. 171, 35 S. Ct. 511, 59 L. Ed. 900.

In Miller v. Wilson, 236 U. S. 373, 35 S. Ct. 342, 344, 59 L. Ed. 628, L. R. A. 1915F, 829, speaking on this general subject, the Supreme Court said: "Dealing with practical exigencies, the legislature may be guided by experience. Patsone v. Pennsylvania, 232 U. S. 138, 144, 58 L. Ed. 539, 543, 34 S. Ct. 281. It is free to recognize degrees of harm, and it may confine its restrictions to these classes of cases where the need is deemed to be clearest. As has been said, it may 'proceed cautiously, step by step,' and 'if an evil is specially experienced in a particular branch of business' it is not necessary that the prohibition 'should be couched in all-embracing terms.' "

And in the later case of Zucht v. King, 260 U. S. 174, 43 S. Ct. 24, 25, 67 L. Ed. 194, the court again expressed its views as follows: "A long line of decisions by this court had also settled that in the exercise of the police power reasonable classification may be freely applied, and that regulation is not violative of the equal protection clause merely because it is not all-embracing. Adams v. Milwaukee, 228 U. S. 572, 57 L. Ed. 971, 33 S. Ct. 610; Miller v. Wilson, 236 U. S. 373, 384, 59 L. Ed. 628, 632, L. R. A. 1915F, 829, 35 S. Ct. 342."

All the zoning ordinances recently upheld by the Supreme Court are discriminatory in the sense that some property holders are permitted to do and others prohibited from doing the same things in localities which are not dissimilar in actual fact. Brown v. Los Angeles, 183 Cal. 783, 192 P. 716; Zahn v. Board, 195 Cal. 497, 234 P. 388; Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Gorieb v. Fox, 274 U. S. 603, 47 S. Ct. 675, 71 L. Ed. 1228, 53 A. L. R. 1210.

We think these authorities and the principles upon which they were described clearly establish that a mere failure to abate one or more nuisance does not prevent the abatement of others by the public authorities nor justify those maintaining the ones sought to be abated in invoking the equitable powers of the court to assist them in maintaining the nuisances against the will and the authority of those empowered and intrusted, under our system of government, with the duty of defining and abating such nuisances.

We think it unnecessary for us to declare or to find whether the exercise of police power in this instance is justified by considerations of public health or of the safety of the community from depredations of vagabonds or criminals operating from or in these cemeteries in the darkness of the night, or because of the menace to the community from fire hazard in the Richmond district, or because of the virtual abandonment of the cemetery by its owners, while the title or ownership of individual lots is being so dissipated by diverse ownership by the lapse of time that those responsible for the upkeep of the cemetery cannot be ascertained or effectively held accountable for its condition, or because of the fact that the cemetery was dedicated to a public purpose to which it is no longer adapted, and for which it is constantly becoming less suitable. It is sufficient to say that local authorities have acted well within those powers vested in them by people in the interest of their general welfare, and the promotion of that general welfare is, after all, the ultimate source of that power reserved to the states and not limited by those provisions of the federal Constitution intended for the preservation of private rights. Such rights, no matter how defined or vested, must give way to the superior claims of the general welfare, and laws enacted to further the general welfare, which do not directly appropriate private property, even though they in effect destroy private rights, are not inhibited by the Constitution of the United States.

We have not discussed the sentimental and religious questions involved in the right

of sepulcher and in the disinterment of bodies of relatives long dead, but we do not wish that it should be inferred because of our silence that we have overlooked or disregarded the significance of these matters. They are not, however, for our determination.

The order granting a temporary injunction is reversed, with directions to the trial court to dismiss the bill of complaint.

RUDKIN, Circuit Judge (concurring).

If the forcible removal of cemeteries from the corporate limits of large cities can ever be justified where the public health is not involved, there was ample ground for the removal here, under the admitted facts. The court below so conceded, for the purpose of its decision at least, but, inasmuch as there are four cemeteries in the same locality, and provision has been made for the removal of only two of them, the court declared the removal ordinance invalid, because it could find no substantial reason for the different treatment applied to the two groups of cemeteries. If the question whether there is any substantial basis for the apparent discrimination between the different cemeteries is a material one, I agree with Judge DIETRICH that the temporary injunction should remain in force until that question has been determined on the final hearing. And if the appellant relies on any such substantial basis for the discrimination, it should have tried that question out in the court below before appealing to this court. In any event, it would have been the safer practice to pursue the latter course, because a failure to do so may eventually result in a reversal of the judgment and a further delay. But the question has been fully presented on the present appeal, and, if as a matter of law the apparent discrimination is immaterial, no good can result from a retrial of that issue in the court below. In my opinion, the consideration referred to is not a material one. The only discrimination claimed is based on mere inaction as to the other cemeteries, and it should be presumed that the municipal authorities will order their removal whenever the public good or public necessity demand it. The mere failure on the part of the city to order the removal of upwards of 100,000 dead bodies from all of these cemeteries, at one and the same time, is not in my opinion a discrimination in favor of or against any of them. The validity of the ordinance has not been successfully challenged, and for that reason I concur in the judgment of reversal.

DIETRICH, Circuit Judge (dissenting).

Aside from the very doubtful question whether the cemetery is an abatable nuisance, in my judgment, the ground upon which the court below held the municipal resolution or legislation invalid is a most serious one. Apparently the conclusion of the majority is predicated upon the proposition that, however arbitrary, unreasonable, or discriminatory such legislative action may be, the courts are powerless to afford relief. That far I am unwilling to go. Appellants are able to make no suggestion, even by way of intelligent surmise or conjecture how any distinction can be drawn between the two cemeteries classified as nuisances and the two excluded. If one is a nuisance, necessarily they are all nuisances. I am not unmindful that in judicial proceedings for abatement it is no defense that all nuisances of like character are not embraced in a single action. In the nature of things, such a course is not ordinarily practicable, for the nuisances are several, and for their maintenance there is no joint responsibility, hence no joint action. It follows that from a court proceeding assailing but one of a number of nuisances of the same character, there is no inference or presumption of intended discrimination. But a legislative body is subject to no such limitations. Here, unless there was intended favoritism and discrimination, the record discloses no reason at all why the legislative order or resolution was not made to apply to the four instead of only two of the cemeteries. In the absence of some showing, it is to be inferred or presumed the difference in treatment was intended to be discriminatory and arbitrary.

In one of the opinions it is suggested, as an imaginable reason why action was taken against only two of the cemeteries, that the total number of bodies buried in the four is very great, and that the municipal authorities may have deemed it impracticable to remove all at once. I say imaginable, for neither in the record nor the brief of appellants do I find such an explanation intimated. Of course some reasonable length of time must be allowed for the removal, even though the ordinance be directed against but one cemetery, and accordingly we find that under the ordinance in question two years' time is given. But if the city authorities intended no discrimination, why not at the same time direct removal from all the cemeteries pro rata over a reasonable period, or at least direct removal from all, in some prescribed order, thus disclosing the intent that in the end all four shall have substantially the same treatment. But again, why, in the present posture of the case, indulge a presumption upon a

subject that might be cleared up by evidence adduced upon a final and full hearing?

It is also suggested in one of the opinions that, if, other conditions being the same, such legislation 'prohibited further burial in the two cemeteries, but in that respect placed no restriction upon the other two, "there might be just claim of discrimination upon which the power of the court might be invoked." If that view be correct, how, logically or in principle, can it be held that the court is powerless here? Assuming that in the supposed case the nuisances are of a more offensive type than those herein involved, is it to be held that a court may protect, against discriminatory treatment, an owner who uses his property for purposes clearly constituting a nuisance, but is powerless to protect, against like treatment, an owner whose use, if offensive at all, constitutes a nuisance of a much less objectionable type?

Apparently, in justification of the discriminatory legislation, it is further suggested that "the removal of any one of the cemeteries would greatly relieve the situation." Assuming that in their collective effect they present a situation constituting a nuisance, it may be true that the removal of only one, even though, as here, that one be the oldest and the smallest, would afford some relief. But, under like reasoning, where there are four soap factories on the same block, all operating in substantially the same way and all emitting odors equally offensive to the surrounding neighborhood, may not the legislative body, with impunity, order the smaller and older ones to move out but leave the larger ones unmolested?

Among the cases I have examined I have found none where, as here, the legislative body has singled out for adverse action one property of a group of several, all alike in point of both location and use. There is scarcely a pretension that this is a "zoning ordinance," but, even as to such legislation, the Supreme Court of the United States in Reinman v. Little Rock, 237 U. S. 171, 177, 35 S. Ct. 511, 513, 59 L. Ed. 900, has used this carefully guarded language:

"While such regulations are subject to judicial scrutiny upon fundamental grounds, yet a considerable latitude of discretion must be accorded to the lawmaking power; and so long as the regulation in question is not shown to be clearly unreasonable and arbitrary, and operates uniformly upon all persons similarly situated in the particular district, the district itself not appearing to have been arbitrarily selected, it cannot be judi-

cially declared that there is a deprivation of property without due process of law, or a denial of the equal protection of the laws, within the meaning of the 14th Amendment."

To me it seems impossible to bring the legislation under consideration within the restrictions thus implied.

Upon the record as it stands, I think plaintiffs are entitled to relief. It might be that ultimately upon a full showing the legislation could be sustained, but, if so, manifestly it must be done by a careful application of general principles to facts which, at most, will not afford a broad basis upon which to rest a holding of validity.

I therefore think the temporary injunction should be continued in force and the parties put to their proofs.